**Robert REIGER, et al., On Behalf of Themselves and All Others Similarly Situated, Plaintiffs,**

v.

**PRICE WATERHOUSE COOPERS LLP, Defendant.**

Nos. 98–CV–0528 W, 98–CV–0553 W, 98–CV–0612 W, 98–CV–0697 W, 98–CV–0806 W, 98–CV–0827 W.

United States District Court, S.D. California.

Oct. 2, 2000.

William S. Lerach, Milberg Weiss Bershad Hynes and Lerach, San Diego, CA, Ellen Gusikoff Stewart, Spector Roseman and Kodroff, Philadelphia, PA, Douglas M. McKeige, Daniel L. Berger, Gerald H. Silk, Bernstein Litowitz Berger and Grossman, New York City, for plaintiffs.

Julia E. Parry Latham and Watkins, San Diego, CA, for defendant.

## *AMENDED* ORDER GRANTING MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT; TERMINATING CASE WITH PREJUDICE

WHELAN, District Judge.

Defendant Price Waterhouse Coopers, LLP moves to dismiss Plaintiffs' Second Amended Class Action Complaint for failure to comply with the pleading requirements of the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 743 (1995). The Court has jurisdiction pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331. Having read and considered the papers submitted, the Court **GRANTS** the motion for the reasons expressed below.

### I. *BACKGROUND*

Altris Software, Inc. ("Altris") is a producer and seller of document management software whose stock traded on the NASDAQ National Market System. (SACAC

¶¶ 2, 36.) [1] Altris retained Defendant Price WaterhouseCoopers LLP ("Price Waterhouse"), a certified public accounting firm, to audit the company's 1996 financial statements. (*Id.* ¶¶ 19, 54.) In connection with the audit, Altris furnished Price Waterhouse with extensive documentation including written contracts, purchase orders, invoices, shipping documents, billing and payment data and installation schedules for at least 25 large transactions. (*Id.* ¶¶ 5, 57.) At the conclusion of its audit, Price Waterhouse issued an opinion stating that Altris' financial statements complied with Generally Accepted Accounting Principles ("GAAP") and that Price Waterhouse had conducted its audit in accordance with Generally Accepted Auditing Standards ("GAAS"). [2] On March 29, 1997 Altris filed its Form 10–K with the Securities and Exchange Commission ("SEC") for the fiscal year ended December 31, 1996. (*Id.* ¶¶ 5, 21.) The Form 10–K included the Price Waterhouse audit opinion. (*Id.* ¶¶ 21, 107.)

Approximately one year later, Altris publicly announced that it had overstated its revenues, earnings and receivables for all of 1996 and the first three quarters of 1997. (*Id.* ¶¶ 2, 27, 40.) Altris advised investors that Price Waterhouse had withdrawn its audit opinion, and that the company would likely issue a restatement reflecting significantly lower revenues than previously reported in the Form 10–K. (*Id.* ¶ 27.)

Later in 1998, Altris issued an Amended Form 10–K that included restated financial results and acknowledged that the company had improperly recognized software sales revenue. For example, Altris admitted that it improperly recognized revenue from transactions where delivery of the product had not occurred, where customers maintained unexpired cancellation rights, and where collectability was doubtful. (*Id.* ¶¶ 37–40.) The restatement reduced 1996 revenues from $24.5 million to $19.5 million and decreased 1996 receivables from $9.7 million to $5.0 million. (*Id.* ¶¶ 14, 28, 41.) Overall, the restatement transformed Altris' previously-reported net income of $2.4 million in 1996 into a loss of approximately $2.5 million. (*Id.*)

## II. RELEVANT PROCEDURAL HISTORY

Between March and May 1998, Plaintiffs filed several securities class action complaints against Altris, Jay V. Tanna, President and CEO of Altris during the Class Period, and John W. Low, the company's Chief Financial Officer and Secretary. [3]

---

**1.** Citations to "(SACAC ¶ _____)" refer to numbered paragraphs in Plaintiff's Second Amended Class Action Complaint filed August 30, 1999.

**2.** Price Waterhouse's audit opinion stated in pertinent part:

To the Board of Directors and Shareholders of Altris Software, Inc.

In our opinion, the consolidated financial statements ... present fairly, in all material respects, the financial position of Altris Software, Inc. and its subsidiaries at December 31, 1996 and 1995, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1996, in conformity with generally accepted accounting principles. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with generally accepted auditing standards which require that we plan and perform the audit to obtain reasonable assurance about whether financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above.

/s/ Price Waterhouse LLP
San Diego, California
February 25, 1997
(SACAC ¶ 107.)

**3.** The actions included: *Reiger v. Altris Software, Inc.,* No. 98–CV–0528, 1999 WL 540893 (S.D.Cal. 1998); *Carmi v. Altris Software, Inc.,* No. 98–CV–0553 (S.D. Cal. filed March 19,

None of these complaints named Price Waterhouse as a Defendant. By order dated September 14, 1998 the Honorable Napoleon A. Jones consolidated the actions, selected a lead plaintiff, and ordered Plaintiffs to file a consolidated complaint within 45 days. (*See Order Granting Plaintiffs' Motion to Consolidate; Granting Reiger Group's Motion for Appointment of Lead Plaintiff; and Denying Carmi Group's Motion of Appointment,* 1998 U.S. Dist. LEXIS 14705 (S.D.Cal.).) On October 29, 1998 Plaintiffs filed their Consolidated Amended Class Action Complaint which asserted two claims against Price Waterhouse: (1) a claim arising under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and (2) a claim arising under the antifraud provisions of the California Corporations Code, Cal. Corp.Code §§ 25400, 25500.

Price Waterhouse subsequently moved to dismiss for failure to plead fraud in accordance with the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 743 (1995) ("Reform Act"), and for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. By order dated April 30, 1999 this Court granted the motion, dismissed Plaintiffs' state law claim with prejudice and dismissed the federal claim with leave to amend. (*See Order Granting Defendant Price Waterhouse's Motion to Dismiss; Granting Leave to Amend,* Fed. Sec. L. Rep. ¶ 90,491, 1999 U.S. Dist. LEXIS 7949, 1999 WL 540893 (S.D.Cal.) ("*Altris I* ").)

On August 30, 1999 Plaintiffs filed the currently-operative Second Amended Complaint alleging a single claim under Section 10(b) and Rule 10b–5.[4] Plaintiffs accuse Price Waterhouse of deliberately ignoring the improperly recognized revenue reflected in Altris' Form 10–K. The Class Period spans from February 26, 1997 (one day after the audit report) until March 11, 1998 (the date Altris indicated that it planned to restate its revenues). (SACAC ¶ 1.) Price Waterhouse now moves to dismiss for failure to plead fraudulent intent in accordance with the Reform Act.

### III. DISCUSSION

To state a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, Plaintiffs must allege (1) a misstatement or omission of material fact, (2) made with scienter, (3) on which Plaintiffs relied that (4) proximately caused their injury. *See McCormick Fund v. American Cos., Inc.,* 26 F.3d 869, 875 (9th Cir.1994). Here, Price Waterhouse challenges the Second Amended Complaint only as to the element of scienter, the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Plaintiffs may establish scienter by showing that Price Waterhouse acted deliberately, knowingly or recklessly. *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir.1978). Recklessness in securities fraud actions, however, requires far more than carelessness or gross negligence; "it

---

1998); *DeMaine v. Altris Software, Inc.,* No. 98–CV–0612 (S.D. Cal. filed April 1, 1998); *Boyce Body Werks v. Altris Software, Inc.,* No. 98–CV–0697 (S.D. Cal. filed April 13, 1998); *Weiser v. Altris Software, Inc.,* No. 98–CV–0806 (S.D. Cal. filed April 29, 1998); *Miller v. Altris Software, Inc.,* No. 98–CV–0827 (S.D. Cal. filed May 1, 1998).

4. On June 6, 1999 Plaintiffs filed a First Amended Class Action Complaint that named Defendants Altris, Tanna, Low and Price Wa-

terhouse. On July 31, 1999 this Court approved a settlement between Plaintiffs and Altris, Tanna and Low, which left Price Waterhouse as the only remaining Defendant.

By stipulation and order dated August 12, 1999, Plaintiffs were granted leave to file a Second Amended Class Action Complaint to remove claims against Altris, Tanna and Low, and to allow Plaintiffs to revise their pleadings in light of *In re Silicon Graphics Inc. Securities Litig.,* 183 F.3d 970 (9th Cir.1999).

instead embraces a conscious state of mind that is inherently deceptive." *In re Baesa Securities Litig.*, 969 F.Supp. 238, 241 (S.D.N.Y.1997). Recklessness involves conduct presenting such an "extreme departure from the standards of ordinary care ... that it was either known to the defendant or so obvious that [he or she] must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)). As recently clarified by the Ninth Circuit:

> Our definition of recklessness ... strongly suggests that we continued to view it as a form of intentional or knowing misconduct. We used the terms "known" and "must have been aware," which suggest consciousness or deliberateness... [R]ecklessness only satisfies scienter under § 10(b) to the extent it reflects some degree of intentional or knowing misconduct.

*In re Silicon Graphics, Inc. Securities Litig.*, 183 F.3d 970, 976–77 (9th Cir.1999) ("*Silicon Graphics*"); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 199 (1st Cir.1999) ("We believe 'reckless' in these circumstances comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence. We perceive it to be not just a difference in degree, but also in kind.") (citation omitted); *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir.1982) (holding that recklessness on the part of an independent auditor "must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.").

Under the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 743 (1995) ("Reform Act"), a complaint alleging violations of Section 10(b) must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u–4(b)(2). In the Ninth Circuit, the Reform Act requires a private securities plaintiff to "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. Congress enacted the Reform Act to deter the filing of frivolous securities fraud lawsuits and to curb the practice of suing "deep pocket defendants, including accountants [ ..., ] who may be covered by insurance, without regard to their actual culpability." *See* H.R. Conf. Rep. No. 104–369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730.

Aside from the substantive definition of scienter and the Reform Act's stringent pleading requirements, several additional obstacles impede the path of a plaintiff who seeks to sue an independent accounting firm for violating Section 10(b). First, a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud. Unlike the officers and directors of the companies it represents, an independent accountant has no ability to line its pockets through insider trading, and no incentive to cover up corporate mismanagement. The accountant's success depends on maintaining a reputation for honesty and integrity, requiring a plaintiff to overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client. *In re Worlds of Wonder Securities Litig.*, 35 F.3d 1407, 1427 n.7 (9th Cir.1994) ("*Worlds of Wonder*"); *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir.1994); *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.1990) (Easterbrook, J.) ("An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses [defendant] would suffer from a perception that it would muffle a client's fraud."). Second, because an independent accountant often depends on its client to provide the information base for the audit, it is almost always more difficult to establish scienter on the part of the accountant than on the

part of its client. *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745, 762 (1992) ("An auditor is a watchdog, not a bloodhound. As a matter of commercial reality, audits are performed in a client-controlled environment."); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.2000) ("[T]he failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability."); *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir.2000) (reversing dismissal of securities complaint in favor of corporation and its officers, but affirming dismissal as to independent accountant). Finally, the report generated by an independent accountant often represents a "professional opinion based on numerous and complex factors." *Bily*, 11 Cal. Rptr.2d 51, 834 P.2d at 763. "Although ultimately expressed in shorthand form, the report is the final product of a complex process involving discretion and judgment on the part of the auditor at every stage. Using different initial assumptions and approaches, different sampling techniques, and the wisdom of 20–20 hindsight, few CPA audits [are] immune from criticism." *Id.; see also In re GlenFed, Inc. Securities Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc) (recognizing that "flexible accounting concepts do not always (or perhaps ever) yield a single correct figure."); *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1020–21 (5th Cir.1996) (same).

In sum, the lack of a rational economic incentive for an independent accountant to participate in fraud, the client's central role in providing information to the accountant, and the complex professional judgment required to perform an audit, make it exceedingly difficult for a securities plaintiff to plead facts suggesting that an independent accountant acted with the deliberate state of mind now required to withstand a motion to dismiss. Here, Plaintiffs contend the Second Amended Complaint meets and exceeds these requirements because it (1) identifies specific "red flags" that alerted Price Waterhouse to Altris' revenue recognition improprieties, (2) provides painstaking detail regarding Altris' violations of GAAP, including specific description of contract documents in Price Waterhouse's possession at the time of the audit, and (3) relies on the magnitude of the subsequent restatement. For the reasons expressed below, the Court finds Plaintiffs' allegations, individually and collectively, insufficient to defeat Price Waterhouse's motion to dismiss.

### 1. *"RED FLAGS"*

Plaintiffs first describe several allegedly suspicious and conspicuous warning signs that, according to Plaintiffs, demonstrate that Price Waterhouse deliberately ignored the falsity of Altris' financial statements. Plaintiffs identify two separate transactions between Altris and two of its value added resellers ("VARs"), Plexxus and Staffware. (SACAC ¶¶ 61–70.) On the last day of 1996, Altris improperly recognized $250,000 in revenue from Plexxus and $338,220 from Staffware as "VAR start-up fees." (*Id.* ¶¶ 61, 69.) Price Waterhouse selected these transactions for testing during its audit, and received the contract files for both transactions. (*Id.* ¶¶ 63, 68.) Altris subsequently reversed the revenue from these transactions. (*Id.* ¶¶ 64, 70.)

According to Plaintiffs, Price Waterhouse deliberately ignored several "red flags" surrounding these transactions: (1) the Plexxus and Staffware VAR start-up fees were incredibly exorbitant; Altris often did not charge start-up fees to its resellers, and never before charged a start-up fee exceeding $5,000; (2) Altris recorded both transactions on the last day of the year; and (3) the contract documentation described the transaction as "special" and the purported product as "X Special." (*Id.* ¶¶ 61, 63, 66, 68–69; Pls.' Opp'n at 6:8–18.)

■ The Court finds these allegations insufficient to raise an inference of

scienter. Where a transaction derives its suspiciousness from specific details associated with the audited company's business, the plaintiff must plead facts suggesting the accountant's awareness of those details. Here, Plaintiffs leave a critical gap unbridged by failing to allege any facts suggesting Price Waterhouse knew the Plexxus and Staffware start-up fees vastly exceeded the fees Altris customarily charged other resellers. For example, Plaintiffs do not allege Price Waterhouse had any experience with Altris' VAR start-up fees and do not allege that a VAR start-up fee appeared in any document previously reviewed by Price Waterhouse. Plaintiffs do not contend any member of Altris management, or any third party, ever informed Price Waterhouse of the historical range of the company's VAR start-up fees.

Plaintiffs urge the Court to infer Price Waterhouse's knowledge from its nine-year relationship with Altris, and from its familiarity with the company's business operations. However, an independent accountant's relationship and acquired familiarity with its client does not impute the accountant with knowledge of every idiosyncratic detail associated with the client's business. *See Rothman*, 220 F.3d at 98 (holding that defendant-accountant's role as company's auditor did not support inference that accountant had knowledge of the specific facts that made certain transactions suspicious). To infer that Price Waterhouse knew the historical range of Altris' VAR start-up fees, based solely on its role as auditor and its familiarity with the company's business affairs, makes too large an inferential leap, and requires too much speculation and conjecture, to satisfy the Reform Act.

Moreover, the other allegedly suspicious facts surrounding these transactions were not so overtly suspicious as to suggest fraud. The timing and structuring of these transactions does not inherently suggest fraud, and could suggest a desire to obtain more favorable tax or regulatory treatment. Price Waterhouse's failure to inquire into the reason for the "X Special" notation in the contract documents may show negligence, but it does not suggest awareness of fraud. Finally, the total revenue derived from the Plexxus and Staffware transactions amounted to less than 3% of the revenues Altris reported in 1996, and less than 10% of the revenues reported in the fourth quarter. In sum, the Plexxus and Staffware transactions do not raise even a weak inference of scienter.[5]

## 2. *GAAP VIOLATIONS*

Plaintiffs identify 12 large transactions, audited by Price Waterhouse, where Altris improperly recognized software sales revenue in violation of GAAP. Plaintiffs accuse Price Waterhouse of turning a blind eye to these GAAP violations.

Generally accepted accounting principles ("GAAP") comprise a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles, approved by the American Institute of Certified Public Accountants ("AICPA"), establish guidelines for measuring, recording and classifying the transactions of a business entity. *See, e.g., SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1222–23 n. 17 (S.D.N.Y.1992). Generally accepted auditing standards ("GAAS") embody the general standards prescribed by the AICPA for the conduct of auditors in the performance of an examination. *Id.*

■ Violations of GAAP or GAAS, standing alone, do not satisfy the particularity or strong inference requirements of the Reform Act because they provide no specific facts upon which a court can infer

---

**5.** Plaintiffs also rely on boilerplate "red flags," present in almost every securities fraud action, that the audited company had weak internal accounting controls and needed to report strong revenues. (SACAC ¶ 56.) These allegations do not meet the particularity and strong inference requirements of the Reform Act, and do not warrant further comment. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.2000)

the state of mind of the accountant or its client, at any specific point in time. They merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care. Thus, violations of GAAP or GAAS, without more, may establish negligence but can never establish scienter under Rule 10b–5 and the Reform Act. *See, e.g., Worlds of Wonder,* 35 F.3d at 1426; *Rothman,* 220 F.3d at 98. Instead, violations of GAAP or GAAS provide evidence of scienter only when accompanied by *additional* facts and circumstances that raise an inference of fraudulent intent. *Worlds of Wonder,* 35 F.3d at 1426; *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000); *Coates v. Heartland Wireless Communications, Inc.,* 100 F.Supp.2d 417, 430 (N.D.Tex.2000).

■ Here, Plaintiffs allege that Price Waterhouse deliberately ignored GAAP violations that appeared in several of Altris' large transactions. (*See* SACAC ¶¶ 61–107.) These GAAP violations consist of repeated failures to follow a single revenue recognition principle: Statement of Position 91–1, Software Revenue Recognition ("SOP 91–1"). SOP 91–1 generally precludes a company from recognizing revenue from software sales where significant uncertainty exists as to whether the company will collect from its customer. SOP 91–1 requires the following conditions before a company can properly recognize software sales revenue: (1) a complete, signed, fixed fee contract must exist; (2) the contract must include an irrevocable, non-contingent obligation to pay the fixed fee within 12 months; (3) delivery of the software must have occurred; (4) no significant vendor obligations remain; and (5) collectibility is probable. (SACAC ¶ 30.) For example, a company should not recognize revenue from a software sale where the parties have not formed a fixed contract or where the customer has cancellation privileges or a right of return. (*Id.* ¶¶ 32, 34.)

Plaintiffs identify and specifically describe 12 transactions where Altris recognized revenue in violation of SOP 91–1. Altris recognized revenue, for example, from software sales where (1) Altris had no signed, fixed and complete agreement with its customer (*id.* ¶¶ 67, 72, 78, 83, 87–88, 96, 102–105); (2) the amount of the software license fee was not fixed, or the contract did not require payment within 12 months (*id.* ¶¶ 84, 87, 99, 104–105); (3) customers and resellers had unexpired cancellation privileges (*id.* ¶¶ 78, 95); and (4) significant obligations on the part of Altris remained that had not been performed (*id.* ¶¶ 91, 99–100, 102–103). Altris allegedly furnished Price Waterhouse with extensive documentation for each of these transactions, and provided unrestricted access to Altris personnel. (*Id.* ¶¶ 13, 57–58.) This documentation, according to Plaintiffs, facially reveals Altris' violations of GAAP and shows that Price Waterhouse turned a blind eye to the accounting improprieties in each transaction. Price Waterhouse concedes that Plaintiffs' allegations establish violations of GAAP, but responds such GAAP violations fail to raise a strong inference of scienter.

The Court finds Plaintiffs' allegations similar to those rejected by *In re Software Toolworks, Inc.,* 50 F.3d 615 (9th Cir.1994) ("*Software Toolworks*"), which affirmed summary judgment in favor of an independent accountant based on the plaintiff's failure to produce probative evidence of scienter. As here, "the plaintiffs presented no direct evidence that [the accountant] knew or recklessly disregarded errors in the financial statements." *Id.* at 627. Instead, the plaintiffs relied on circumstantial evidence consisting of the underlying agreements which were "poorly documented, informal, and conditional." *Id.* The plaintiffs also accused the accountant of failing to obtain written confirmations for several transactions, and of deviating from its audit plan in reviewing the contracts. *Id.* The Ninth Circuit noted that such alle-

gations could not generally support an inference of scienter:

> The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. Scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*Id.* at 627–28 (internal alterations, citations and quotations omitted). Turning to the plaintiff's allegations, the court held that the accountant's failure to investigate further established, at most, "that [the accountant] was negligent in auditing [the client], not that [the accountant] recklessly or knowingly falsified the financial statements." *Id.* at 627–28.

Plaintiffs attempt to distinguish *Software Toolworks* as a decision involving a motion for summary judgment granted after the plaintiffs had an opportunity for discovery. (Pls.' Opp'n at 22.) This argument overlooks the obvious difference between a motion for summary judgment and a motion to dismiss governed by the Reform Act; as to the issue of scienter, it is *more* difficult to overcome a motion to dismiss than to defeat a motion for summary judgment. As noted in *Software Toolworks,* "[s]ummary judgment on the scienter issue is appropriate only if 'there is no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter.'" 50 F.3d at 626 (quoting *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1117 (9th Cir.1989)); *Webster v. Omnitrition Intern., Inc.,* 79 F.3d 776, 785 (9th Cir.1996) (holding that district court may not grant summary judgment if facts support a "reasonable inference" of scienter). *Software Toolworks* establishes that a violation of GAAP or GAAS, without more, cannot raise even a *rational* inference that an independent accountant acted with scienter. Under the Reform Act, however, factual allegations must transcend rational or reasonable inferences, and must instead raise a "strong inference" of scienter. *See Silicon Graphics,* 183 F.3d at 985 ("It is not enough for [Plaintiff] to state facts giving rise to a mere speculative inference of deliberate recklessness; or even a reasonable inference of deliberate recklessness."); 15 U.S.C. § 78u–4(b)(2). A set of facts sufficient to overcome summary judgment may not clear the significantly higher hurdle of the Reform Act's "strong inference" requirement. Because GAAP violations do not permit even a reasonable inference of scienter, they offer little assistance to Plaintiffs.

Plaintiffs next argue that, unlike the plaintiffs in *Software Toolworks,* the allegations in the Second Amended Complaint transcend mere identification of GAAP and GAAS violations. Plaintiffs contend Altris furnished Price Waterhouse with specific documentation facially revealing that Altris had recognized revenue in violation of GAAP, which shows that Price Waterhouse consciously disregarded Altris' improper revenue recognition. (Pl.'s Opp'n at 15.)

The Court finds Plaintiffs' argument—that because Price Waterhouse had access to Altris' contract files, it must have known of the GAAP violations—wholly without merit. The Reform Act does not permit district courts to speculate as to the existence of unpled and unidentified facts that could raise a strong inference of scienter. *See Silicon Graphics,* 183 F.3d at 985; *In re Comshare, Inc. Securities Litig.,* 183 F.3d 542, 553 (6th Cir.1999) ("[C]laims of securities fraud cannot rest on speculation and conclusory allegations.") (quotations omitted). Plaintiffs invite the Court to speculate that Price Waterhouse (1) closely reviewed the documents provided by Altris, (2) discovered the GAAP violations

contained therein, then (3) deliberately chose to ignore them.[6] Plaintiffs plead no facts to support this inferential chain beyond Price Waterhouse's possession of documents which would lead a reasonable accountant to discover its client's fraud. *Cf. Worlds of Wonder*, 35 F.3d at 1426 (holding that plaintiff failed to show that accountant acted with scienter notwithstanding that accountant admitted that it had "full information" about the terms of its client's allegedly fraudulent transactions). This argument invites too much speculation to satisfy either the particularity or strong inference requirements of the Reform Act.

Plaintiffs rely on several decisions handed down by district courts outside the Ninth Circuit that found a strong inference of scienter by combining accounting improprieties with an accountant's alleged disregard of "red flags." *See, e.g., In re Ikon Office Solutions, Inc. Securities Litig.*, 66 F.Supp.2d 622, 629 (E.D.Pa.1999); *In re Oxford Health Plans, Inc. Securities Litig.*, 51 F.Supp.2d 290, 294–296 (S.D.N.Y. 1999); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F.Supp. 192, 202–203 (E.D.N.Y. 1997). Each of these cases, however, vividly demonstrates what is missing from the Second Amended Complaint. For example, *Ikon Office Solutions* involved an accountant whose own file contained handwritten notes revealing that the client's management told the accountant that an employee was "cooking the books." 66 F.Supp.2d at 629. The accountant in *Oxford Health Plans* knew that its client had

recently been fined $3 million for regulatory violations by the New York State Insurance Department and had been under investigation by the attorney general. 51 F.Supp.2d at 295. The accountant in *Health Mgmt.* had, in its hands, a letter from an analyst specifically warning that the client had improperly inflated its accounts receivable. 970 F.Supp. at 203. The warning signs in these cases more closely resembled "smoking guns" than "red flags." Each case included specific facts suggesting the independent accountant consciously entertained doubts about the veracity of its client's financial disclosures, either from a client or third party informing the accountant of the client's fraud, or from contemporaneous statements made by the accountant.[7] Here, Plaintiffs cannot identify any facts suggesting actual awareness of Altris' revenue improprieties. Plaintiffs do not identify any letters, notes, memos, telephone calls, or conversations that expressly or even impliedly suggest Price Waterhouse was on notice of Altris' revenue scheme. Plaintiffs' purported "red flags" consist of Price Waterhouse's possession of documentation which, if properly reviewed pursuant to GAAP and GAAS, would have revealed improperly recognized revenue. At most, these allegations raise an inference of gross negligence, but not fraud.

Although not necessary to this decision, the Court notes that additional facts in the Second Amended Complaint tend to diminish any inference of scienter. For example, the Second Amended Complaint re-

---

**6.** Although Plaintiffs clearly have possession of these contract documents, they failed to attach any of them to their Second Amended Complaint or their opposition to Price Waterhouse's motion to dismiss. As such, the Court cannot assess whether the improper contingencies in these transactions ensued from glaringly obvious flaws on the face of the contract documents, or from a combination of omissions and obscure terms.

**7.** Plaintiffs also rely on several unpublished district court decisions, including *Retsky Family Limited Partnership v. Price Waterhouse LLP*, No. 97–C–7694, 1998 WL 774678, 1998

U.S. Dist. LEXIS 17459 (N.D.Ill. Oct.21, 1998) and *Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 CIV. 3374(RPP), 1999 WL 101772, 1999 U.S. Dist. LEXIS 2102 (S.D.N.Y. March 1, 1999). These and the other decisions cited by Plaintiffs either identified specific warning signs the accountant-defendant knew about and ignored, or described an ubiquitous failure to follow basic audit procedures. Here, Price Waterhouse's failure to detect violations of SOP 91–1 amid an otherwise reasonable audit does not show awareness of fraud or an egregiously deficient audit.

veals that after Altris issued its Form 10–K, Price Waterhouse uncovered the improper revenue recognized in most of the transactions described above, and concluded that a restatement of revenues was required. (SACAC ¶¶ 6–8, 13, 64, 70, 76, 82, 89, 93–94.) Plaintiffs make no attempt to explain why Price Waterhouse would deliberately ignore improperly recognized revenues, and then, several months later, recommend a restatement of those revenues. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.1990) ("One who believes that another has behaved irrationally has to make a strong case."). These allegations tend to negate any inference that Price Waterhouse deliberately concealed or ignored the GAAP violations described above.[8]

### 3. *MAGNITUDE OF FRAUD*

■ As discussed previously, in 1998 Altris restated its 1996 financial results to reflect a loss of $2.45 million, rather than the $2.36 million profit the company previously reported in its Form 10–K. (SACAC ¶¶ 14, 28, 41.) Plaintiffs argue that the magnitude of this improperly recognized revenue provides further evidence of Price Waterhouse's scienter. (Pl.'s Opp'n at 19.) This Court outright rejected this argument in its previous order, holding that "[t]he mere magnitude of Altris' subsequent financial restatements provides no indication of how or when Price Waterhouse became aware of the misstatements in Altris' earlier disclosures." *Altris I*, 1999 WL 540893, at *7. Nothing in the Second Amended Complaint alters the Court's conclusion.

Inferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the accountant acted with scienter. To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of inferences: (1) because the magnitude of the fraud was large, conspicuous warning signs must have existed; (2) these warning signs must have been available to the outside accountant during the audit; (3) these warning signs must have made the fraud obvious and conspicuous to the accountant; and therefore (4) the accountant must have known of the fraud. The factual assumptions incorporated into this inferential chain lack evidentiary support in many securities fraud cases, and obscure the potentially infinite number of innocuous reasons an accountant may fail to detect a fraud of large magnitude. For example, the magnitude of fraud could flow from improprieties in transactions that fell outside the scope of the audit, or from manipulations the company concealed from its accountant and the public. *See In re Livent, Securities Litig.*, 78 F.Supp.2d 194, 217 (S.D.N.Y.1999) (refusing to infer accounting firm's scienter from large magnitude of fraud where "the magnitude of the fraud was accompanied by the thoroughness of its concealment"). To avoid undermining the policies of the Reform Act through reliance on hindsight and speculation, a court should not infer an independent accountant's scienter based solely on the magnitude of its client's fraud. Rather, magnitude of fraud supports an inference of scienter only when the plaintiff pleads specific and detailed facts showing that the magnitude either enhanced the suspiciousness of specifically identified transactions, or made the overall fraud glaringly conspicuous.

Here, Plaintiffs provide no explanation as to how the magnitude of the Altris restatement provides or enhances any inference that Price Waterhouse acted with scienter. The vast majority of the restated revenues resulted from transactions

---

8. *Accord Cheney v. Cyberguard Corp.*, —— F.Supp.2d ——, 2000 WL 1140306, at *12 (S.D.Fla. July 31, 2000) (dismissing securities fraud complaint against independent accountant based on similar facts, and noting that "the fact that [the accountant] discovered and revealed the [company's] revenue recognition policy the following year counters an inference of scienter").

where Altris recognized software sales revenue in violation of GAAP. The fact that much of the improperly recognized revenue derived from large transactions may suggest that Price Waterhouse negligently failed to give these transactions closer scrutiny. However, neither the size of any individual transaction nor the magnitude of the overall fraud reasonably permits this Court to infer that Price Waterhouse consciously entertained doubts as to the propriety of the revenue recognized in 1996.

### 4. *SCIENTER—SYNTHESIS*

For the reasons expressed above, the Court concludes that the Second Amended Complaint fails to "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics,* 183 F.3d at 974. Plaintiffs' allegations portray Price Waterhouse as an accountant that performed a complete audit of its client, but inexcusably failed to detect violations of a single, very important, revenue recognition principle. Because nothing in the Second Amended Complaint strongly suggests knowledge or deliberate recklessness, Price Waterhouse's conduct must fall somewhere between ordinary and gross negligence. *See Greebel,* 194 F.3d at 199 (describing distinction between recklessness and negligence as "not just a difference in degree, but also in kind"). Because no degree of negligence can satisfy the substantive element of scienter, or raise a strong inference of scienter under the Reform Act, the Court GRANTS Price Waterhouse's motion to dismiss. *See* 15 U.S.C. § 78u–4(b)(3)(A) (mandating dismissal under the Reform Act for failure to adequately plead scienter).

## IV. *LEAVE TO AMEND*

Price Waterhouse asks this Court to dismiss Plaintiffs' Second Amended Complaint without leave to amend. (Def.'s Mot. at 19.)

In deciding whether to grant leave to amend, district courts may consider several factors including undue delay, prejudice to the opposing party, futility of the amendment, bad faith and whether plaintiff has previously amended the complaint. *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994). "Although there are strong public policy justifications urging liberality in granting leave to amend, futility of amendment can, by itself, justify the denial of ... leave to amend." *Gentala v. City of Tucson,* 213 F.3d 1055, 1061 (9th Cir.2000) (internal quotations and alteration omitted). A district court's discretion to deny leave to amend is particularly broad where, as here, a plaintiff has already had a previous opportunity to amend its complaint. *Kaplan,* 49 F.3d at 1370.

It does not appear that further amendment will generate any new factual allegations capable of averting dismissal under the Reform Act. Plaintiffs' allegations against Price Waterhouse, according to the Second Amended Complaint, "derived from an extensive review ... of Altris' internal contract and accounting documents." (SACAC ¶ 4.) Indeed, the Second Amended Complaint identifies and describes invoices, purchase orders, revenue summaries, contract summaries, customer lists, letters from customers, audit confirmations and the Altris restatement workpapers. (*See, e.g., id.* ¶¶ 7, 10, 61, 65, 75, 77, 86, 93, 97, 100, 102–104.) Plaintiffs interviewed key Altris personnel involved in the audit, in the United States and the United Kingdom. (*Id.* ¶¶ 4, 55.) Despite the wealth of evidence Plaintiffs drew upon in drafting their Second Amended Complaint, they have once again failed to allege facts raising a strong inference that Price Waterhouse acted with scienter. Under these circumstances, Plaintiffs' failure to identify direct or strong circumstantial evidence of scienter suggests that no such evidence exists.

In addition, unlike their response to Price Waterhouse's previous motion to dismiss, Plaintiffs did not request leave to

amend in opposing the instant motion. Plaintiffs apparently do not believe they can plead additional facts to bolster their allegations of scienter. Moreover, Plaintiffs' allegations would fail under the Reform Act standard articulated by this Court's previous order—a standard significantly more lenient than the one subsequently adopted by *Silicon Graphics*. The Court therefore declines to grant leave to amend because it would constitute an exercise in futility.

## V. CONCLUSION AND AMENDED ORDER

In light of the foregoing, the Court **GRANTS** Price Waterhouse's motion to dismiss and **DISMISSES** the Second Amended Complaint **WITH PREJUDICE.** The Clerk of Court shall close the file on this and all consolidated actions.

**IT IS SO ORDERED.**