### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

### SOLUCORP INDUSTRIES LTD., Joseph S. Kemprowski, Peter R. Mantia, James G. Spartz, Robert Kuhn, Victor Herman, Arle Pierro, W. Bryan Fair and Glenn R. Ohlhauser, Defendants.

### No. 99 CIV. 11965(WCC).

United States District Court, S.D. New York.

April 26, 2002.

Securities and Exchange Commission (Treazure R. Johnson, Esq., Peter R. Bresnan, Esq., Nina B. Finston, Esq., Michael K. Lowman, Esq., Of Counsel), Washington, DC, for Plaintiff.

McDonough Marcus Cohn Tretter Heller & Kanca, LLP (Andrew G. Tretter, Esq., Of Counsel) New Rochelle, NY, for Defendant Glenn R. Ohlhauser.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Securities and Exchange Commission ("SEC") brings the instant action against defendants Solucorp Industries Ltd. ("Solucorp"), Joseph S. Kemprowski, Peter R. Mantia, James G. Spartz, Rober Kuhn, Victor Herman, Arle Pierro, W. Bryan Fair and Glenn R. Ohlhauser pursuant to § 10A of the Securities Exchange Act of 1934, 15 U.S.C. § 78j–1 (the "Exchange Act"). Plaintiff alleges, inter alia, that during the course of an audit of Solucorp's December 31, 1998 financial statements, Ohlhauser failed to comply with the requirements enumerated in § 10A(b). Ohlhauser now moves for summary judgment pursuant to FED. R. CIV. P. 56 and, in the alternative, for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c). For the reasons stated hereinafter, the motion is denied.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed for the purposes of

this motion.[1] Solucorp, a Canadian corporation headquartered in New York, engages in the treatment and disposal of contaminated soil and in the developing, marketing and licensing of products for use in environmental cleanups, including the "Molecular Bonding System" ("MBS"). (Pl. Rule 56.1 Stmt. ¶ 1.) Ohlhauser, a Chartered Accountant licensed in British Columbia, was a partner in the accounting and auditing firm of MacKay and Partners LLP ("MacKay") from late 1996 through 1999. (*Id.* ¶ 3.)

Ohlhauser was the partner in charge of auditing Solucorp's financial statements for several years, including the audit for the fiscal year ended June 30, 1997. (*Id.* ¶¶ 5, 7.) In December 1997, Ohlhauser was informed by Victor Herman, the chief financial officer of Solucorp's chief operating subsidiary, that Solucorp intended to file a registration statement with the SEC that would include the June 30, 1997 audited financial statements as well as unaudited financial statements for the quarter ended September 30, 1997. (*Id.* ¶ 20.) Because the September 30, 1997 statements were prepared in accordance with Canadian Generally Accepted Accounting Principles ("GAAP"), Herman asked Ohlhauser to reconcile the statements with United States GAAP for inclusion in the SEC filing. (*Id.* ¶ 21.)

Solucorp's financial statements for the quarter ended September 30, 1997 included $500,000 in accrued license fees payable by Smart International Ltd. ("Smart"). (*Id.* ¶ 23.) The license fees comprised 40% of total revenues for the quarter. (*Id.*) As of December 1997, the only document evi-

dencing any agreement between Solucorp and Smart was a Licensing Agreement in Principle ("Agreement in Principle") dated June 4, 1997. (*Id.* ¶ 11; Finston Decl., Ex. 9.) The Agreement in Principle provided that Smart would obtain six-year licensing rights to use MBS to remediate contaminated soil in China in return for a $2 million licensing fee paid to Solucorp for the first year. (Pl. Rule 56.1 Stmt. ¶ 11.) If the initial fee could not be funded from commercial projects, payment could include the expected profits from Smart's exercise of an option to purchase 200,000 shares of Solucorp stock. (*Id.*) The fees for the remaining term of the license were to be negotiated by the parties on the basis of a "Market Survey" to be conducted by Smart. (*Id.*) The Agreement in Principle elaborated that "[t]his Agreement is subject to [Smart] completing a Market Survey within sixty (60) days of this date, and establishing viable operations and agreeing on-going (sic) financial arrangements with Solucorp within a further four (4) months." (*Id.*)

At least one member of Solucorp's Board of Directors was aware that more work was required to finalize the agreement. (*Id.* ¶ 11.) On September 25, 1997, Solucorp announced that the Market Survey would be completed in October, and on October 21, 1997, Solucorp received $150,000 in fees from Smart. (*Id.* ¶¶ 12, 13.) In a press release issued October 22, 1997, Solucorp announced the payment and stated that "Solucorp officials will arrive in China on November 9, 1997, to finalize terms of the agreement with

---

1. Pursuant to Local Civil Rule 56.1, plaintiff submitted a statement of facts in opposition to Ohlhauser's motion. In his reply affidavit, Andrew G. Tretter, Ohlhauser's attorney, stated that "[f]or the purposes of this motion only, defendant Ohlhauser does not contest the statement of facts as set forth in the Rule 56.1 Statement of plaintiff SEC." (Tretter Reply Aff. ¶¶ 5, 13.) Accordingly, while Ohlhauser is free to present contrary facts during trial, for the purposes of the instant motion we will presume as true the facts presented by plaintiff.

Smart." (*Id.* ¶ 14.) The October 22 press release was included among the documents produced by MacKay during discovery in the instant action. (*Id.*) Solucorp did not recognize any license fees for the period ended June 30, 1997. (*Id.* ¶ 17.) However, a footnote to the June financial statements described the terms of the June 4, 1997 agreement, including the five-year term and the anticipated issuance to Smart of the 200,000 share option, stating that "[s]ubsequent to year end, the agreement was finalized." (*Id.* ¶ 18.)

After reviewing the Agreement in Principle, Ohlhauser concluded that recognition of revenue was improper for the quarter ended September 30, 1997 because the Agreement in Principle was contingent upon the Market Survey and was insufficiently definite as to Smart's obligation to pay a license fee. (*Id.* ¶ 24.) Ohlhauser informed Herman of his concerns in a memorandum dated December 18, 1997. (*Id.*) In a subsequent phone conversation, Herman responded that revenue recognition was appropriate because Solucorp and Smart had been negotiating a final agreement for several months, and that Solucorp management had traveled to China in the fall for that purpose. (*Id.* ¶ 25.) Herman further explained that the final agreement, which had yet to be memorialized, would address Ohlhauser's concerns and that Smart had already paid $200,000 and was expected to pay the additional $300,000. (*Id.*) Unconvinced, Ohlhauser sent Solucorp's outside counsel a copy of his December 18 memorandum. (*Id.* ¶ 26.) During a conversation with Herman and outside counsel on December 19, 1997, outside counsel reiterated that Herman did not agree with Ohlhauser's assessment. Herman also requested that MacKay cease all work with respect to the September 30, 1997 financials with the exception of completing the reconciliation to United States GAAP. (*Id.*)

Solucorp filed its form 10–KSB registration statement with the SEC on December 22, 1997. (*Id.* ¶ 32.) Pursuant to 17 C.F.R. § 228.601(b)(10), Solucorp was required to attach copies of all material contracts. With respect to Smart, the Agreement in Principle was attached. (*Id.*) The only mention of the parties finalizing the terms of the agreement was contained in the aforementioned footnote to the June financials. (*Id.*)

In late 1997, Solucorp changed its fiscal year-end from June 30 to December 31. (*Id.* ¶ 33.) In its financial statements for the six-month transition period ended December 31, 1997 (the "December financials"), Solucorp recognized $1,090,000 in Smart license fees comprising approximately 50% of total revenues. (*Id.* ¶ 35.) In early 1998, Ohlhauser audited the December financials for inclusion in a Form 10–K to be filed with the SEC. (*Id.* ¶ 34.)

Still concerned about revenue recognition, Ohlhauser wrote to Herman on February 27, 1998 that revenue "should be recognized when reasonable assurance exists regarding measurement and collectibility." (*Id.* ¶ 36.) Accordingly, Ohlhauser requested information relating to Smart's ability to pay and requested to see a copy of the final license agreement negotiated by the parties. (*Id.*) Solucorp provided Ohlhauser with a copy of the final license agreement (the "License Agreement") that superseded the Agreement in Principle. (*Id.* ¶ 37.) The License Agreement had a commencement date of June 1, 1997 and was "dated as of" September 15, 1997. (Finston Decl., Ex. 25.) Although the License Agreement was executed on or about December 30, 1997, the signers of the agreement both cited September 15, 1997 as their signature date. (Pl. Rule 56.1 Stmt. ¶ 28.)

After reviewing the License Agreement, Ohlhauser wrote to Herman on March 10, 1998 that:

> I am still concerned with accounting for license agreement with Smart. This agreement is dated September 15, 1997, however it was not referred to on the 10–KSB [filed with the Commission on December 22, 1997] ... It appears that this agreement has been 'backdated' and I don't know exactly how you reconcile this with information contained in the first 10–KSB. I don't know what SEC may say if these new 'facts' aren't consistent with items previously filed.

(*Id.* ¶ 37.) Herman responded, in apparent contrast to his prior representations, that he believed Solucorp had negotiated the contract during a visit to China on September 15, 1997. On March 22, 1998, Ohlhauser also drafted a memorandum addressed to Rick Day, a partner of McGladrey Pullen LLP, an accounting firm located in the United States. (*Id.* ¶ 40.) The memorandum commented that:

> During the course of Dec/97 audit we were now presented with final Smart agreement which was dated September 15, 1997. Because we never saw it before, we suspect that this was actually backdated and more likely actually signed sometime after the 10–SB filing ... Contract supposedly commences from June 1, 1997. ... I don't think revenue can be recognized before agreement is signed, even if agreement supposedly started earlier. Prior to September 15 there was no agreement therefore revenue cannot be recognized before this date. ... As noted we believe the three-month statement prepared by management is incorrect.

(*Id.* ¶ 39.) The parties disagree as to whether the memorandum was ever sent and subsequently received by Day.

At the same time that Ohlhauser was investigating the issues arising from the backdating of the License Agreement, he was also concerned about the collectibility of the license fee. As of December 31, 1997, Smart had made a $150,000 cash payment on October 21, 1997 and agreed to offset $350,000 in overdue license fees against an equivalent amount Solucorp would owe to Smart for production of calcium sulfide used in the MBS process. (*Id.* ¶ 42.) As of April 1998, Smart had made no further payments, although $1.5 million in fees were due as of March 31, 1998. (*Id.*) Ohlhauser received confirmation from Smart on March 4, 1998 as to the amounts paid and owed. (*Id.* ¶ 43.) However, Herman refused Ohlhauser's request to obtain financial statements from Smart, statements that, if obtained, would have revealed that as of March 31, 1997 Smart was dormant and had only minimal assets. (*Id.* ¶ 44.) Herman did send Ohlhauser unrelated photos of Smart's facilities and of meetings in November 1997 between Smart representatives and Chinese government officials. (*Id.* ¶ 45.) Ohlhauser dismissed this information as having no bearing on collectibility. (*Id.*) In his final memorandum to file dated April 14, 1998, Ohlhauser wrote that McGladrey Pullen advised him that Solucorp's accrual of the license fee appeared reasonable provided that collectibility could be properly determined. Ohlhauser commented that he had "no information on ability of Smart to pay," and that as "audit evidence we have confirmation from Smart plus fact that Smart continues to be the company's supplier of its main chemical agreement (*sic*)." (Finston Decl., Ex. 34.)

Ohlhauser expressed an unqualified audit opinion on Solucorp's financial statements for the six-month transition period ended December 31, 1997. (Pl. Rule 56.1 Stmt. ¶ 49.) The statements were included in Solucorp's Form 10–K filed with the

SEC on April 15, 1998. (*Id.*) Ohlhauser is no longer a partner or employee of Mac-Kay and is not currently the responsible party for any audits of publicly traded companies subject to SEC regulation, although he is employed as a consultant to an accounting firm in British Columbia. (Ohlhauser Aff. ¶¶ 4–5.) The SEC now contends that during the course of conducting the audit, Ohlhauser became aware of information indicating that Solu-corp backdated the License Agreement for the purpose of improperly recognizing license fees in violation of GAAP and the federal securities laws. The SEC further charges that Ohlhauser failed to take the appropriate steps required by § 10A(b).

## DISCUSSION

### I. *Summary Judgment Standard*

Defendants move for summary judgment pursuant to FED. R. CIV. P. 56. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 254 (E.D.N.Y.1999). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ticali,* 41 F.Supp.2d at 254. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See*

*Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.,* 947 F.2d 1021, 1022 (2d Cir.1991).

### II. *Section 10A*

In 1995, Congress enacted § 10A of the Exchange Act which imposed certain obligations on independent public accountants. The section provides, in relevant part,

(b) Required response to audit discoveries

A. Investigation and report to management

If, in the course of conducting an audit ..., the independent public accountant detects or otherwise becomes aware of information indicating that an illegal act (whether or not perceived to have a material effect on the financial statements of the issuer) has or may have occurred, the accountant shall, in accordance with [GAAS] ...

(A)(i) determine whether it is likely that an illegal act has occurred; and

(ii) if so, determine and consider the possible effect of the illegal act on the financial statements of the issuer, including any contingent monetary effects, such as fines, penalties, and damages; and

(B) as soon as practicable, inform the appropriate level of the management of the issuer and assure that the audit committee of the issuer, or the board of directors of the issuer in the absence of such a committee, is adequately informed with respect to illegal acts that have been detected or have otherwise come to the attention of such accountant in the course of the

audit, unless the illegal act is clearly inconsequential.

B. Response to failure to take remedial action

If, after determining that the audit committee of the board of directors of the issuer ... is adequately informed with respect to illegal acts that have been detected or have otherwise come to the attention of the accountant in the course of the audit of such accountant, the independent accountant concludes that—

(A) the illegal act has a material effect on the financial statements of the issuer;

(B) the senior management has not taken ... timely and appropriate remedial actions ...; and

(C) The failure to take remedial action is reasonably expected to warrant departure from a standard report of the auditor, when made, or warrant resignation from the audit engagement;

the independent public accountant shall, as soon as practicable, directly report its conclusion to the board of directors.

15 U.S.C. § 78j–1(b)(1)–(2).

■ Ohlhauser argues that he is entitled to summary judgement because the SEC fails to allege facts showing that he had actual knowledge of, or was reckless as to the existence of, any illegal acts. However, Ohlhauser attempts to read into the plain language of § 10A a scienter requirement that does not exist. *See United States v. Kinzler*, 55 F.3d 70, 72 (2d Cir.1995) (observing that "[s]tatutory interpretation starts with the language of the statute itself"). A public accountant is required to abide by the procedures enumerated in § 10A(b) if, during the course of an audit, he "detects or otherwise becomes aware of *information* indicating that an illegal act ... has *or may have* occurred." 15 U.S.C. § 78j–1(b) (emphasis added). Contrary to Ohlhauser's argument, the statute does not require that the auditor become aware of illegal acts in order for the section to apply. In fact, having become aware of information indicating that an illegal act may have occurred, an auditor is then required to determine whether "it is likely that an illegal act has occurred." 15 U.S.C. § 78j–1(b)(1)(A)(i). Should we adopt Ohlhauser's interpretation of the statute, it would render this latter provision superfluous. If the auditor already understood that an illegal act had occurred, it would be non-sensical to require the auditor to determine whether it is likely that an illegal act has occurred. *See Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 877, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) ("Our cases consistently have expressed 'a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment.'") (quoting *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 562, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)); *see also Litwin v. American Express Co.*, 838 F.Supp. 855, 859 (S.D.N.Y.1993) ("When a litigant would give a statute a meaning that yields absurd results, that is a fair indication that the statute doesn't mean what that litigant has suggested."). Accordingly, we conclude that under the plain and unambiguous terms of the statute an auditor becomes subject to the § 10A requirements upon acquiring knowledge of information indicating that an illegal act may have occurred.[2]

---

**2.** As plaintiff contends that Ohlhauser had actual knowledge of the relevant information, we need not consider whether negligence and/or recklessness would similarly satisfy § 10A.

The SEC contends that Ohlhauser violated § 10A(b)(1) because he was aware of information that Solucorp and Smart illegally backdated the License Agreement in order to improperly recognize revenue. They allege that, contrary to the strictures contained in § 10A(b)(1), he failed to adequately investigate whether an illegal act had occurred and failed to apprise management and assure that the audit committee was made aware of his concerns. Ohlhauser moves for summary judgment, arguing: (1) that the SEC failed to plead even the minimal standard of recklessness on the part of Ohlhauser with respect to his treatment of the License Agreement; and (2) that there was no information indicating that an illegal act may have occurred. (Pl. Mem. Supp. Summ. J. at 15, 20.)

With respect to the former, having already determined that § 10A requires only knowledge of facts indicating that an illegal act may have occurred, any failure on the part of the SEC to allege reckless or fraudulent behavior is immaterial. In support of his argument, Ohlhauser directs this Court to numerous prior cases in which the court found in favor of the defendant auditor because the requisite scienter was absent. *See, e.g., Rothman v. Gregor*, 220 F.3d 81 (2d Cir.2000); *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.2000); *In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131 (D.Mass.2001); *In re Livent, Inc. Sec. Litig.*, 148 F.Supp.2d 331 (S.D.N.Y.2001); *Reiger v. Price Waterhouse Coopers LLP*, 117 F.Supp.2d 1003 (S.D.Cal.2000). However, all these cases were brought pursuant to § 10(b) of the Securities Exchange Act, a provision designed to prohibit fraudulent activities in connection with securities transactions. Under § 10(b), no "private cause of action for damages will lie ... in the absence of any allegation of 'scienter'—intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The instant action, however, is brought pursuant to § 10A. This provision, while ultimately aimed at preventing the abuses directly proscribed in § 10(b), does not itself prohibit fraudulent activity, but rather requires independent public accountants to conduct audits in accordance with Generally Accepted Auditing Standards ("GAAS"), and to comply with certain enumerated reporting requirements should they uncover suspicious activity during an audit. While Congress could have incorporated into § 10A a scienter requirement similar to that found in the anti-fraud provisions of § 10(b), the plain and unambiguous language of the statute indicates that they did not.

■ Finally, there is a genuine issue of fact as to whether Ohlhauser was aware of information indicating that an illegal act may have occurred. As late as March 22, 1997, Ohlhauser expressed concern that the License Agreement was backdated and that Solucorp improperly recognized revenue from license fees in their financial statements to be filed with the SEC. Ohlhauser argues that the SEC fails to allege an illegal act because the backdating of contracts is a common and permissible business practice. We do not dispute that certain contracts may be legitimately backdated. However, the SEC alleges that the License Agreement at issue here was backdated pursuant to an effort to defraud investors with misleading financial statements. Such conduct, if proven, falls squarely within the regulatory ambit of § 10A. *See* Thomas Riesenberg, *Trying to Hear the Whistle Blowing: The Widely Misunderstood "Illegal Act" Reporting Requirements of Exchange Act Section 10A*, 56 Bus. Law 1417, 1436 (August 2001) (commenting that "the statute clearly covers activities that are directly intended to defraud investors through the dissemina-

tion of false or misleading financial statements"). Accordingly, Ohlhauser's motion for summary judgment is denied with respect to this issue.

## III. *Injunctive Relief*

Ohlhauser moves for summary judgment on the ground that the SEC cannot, as a matter of law, obtain a permanent injunction under Section 21(d) barring Ohlhauser from future violations of § 10A. Specifically, he contends that: (1) the SEC has failed to allege any likelihood that Ohlhauser will violate § 10A in the future; and (2) the SEC failed to plead and prove scienter, which Ohlhauser maintains is a prerequisite to obtaining the injunctive relief sought here.

■ To obtain an injunction under Section 21(d) of the Exchange Act, the SEC must demonstrate that there is a reasonable likelihood that the defendant will engage in future violations. *See SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir.1978); *see also SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir.1998). In making such a determination, a court will examine the following factors:

> the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*Cavanagh*, 155 F.3d at 135 (quoting *Commonwealth Chem. Sec.*, 574 F.2d at 100). Furthermore, "[n]o single factor is determinative; instead, the district court should determine the propensity for future violations based on the totality of circumstances." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1228 (D.C.Cir.1989).

■ Applying the aforementioned factors to the instant case, it is clear that several issues of fact exist as to whether a permanent injunction is appropriate. There is at minimum a reasonable possibility that Ohlhauser ultimately will be found liable for violating § 10A. There is also evidence that Ohlhauser was previously investigated by the British Columbia Securities Commission for failing to conduct an audit of Solucorp's 1995 financial statements in accordance with Canadian GAAS. (Pl. Rule 56.1 Stmt. ¶ 6.) Moreover, despite Ohlhauser's representation that he "presently [has] no plans to be the auditing partner or responsible party for an audit of any company that files statements with the [SEC]," (Ohlhauser Aff. ¶ 17), he is not foreclosed from doing so as he is currently a consultant to a Canadian accounting firm and retains his status as a Chartered Accountant. While Ohlhauser further represents that he has no intention of violating the Exchange Act in the future, this presents a credibility issue inappropriate for disposition on summary judgment. *See SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir.1978). We therefore cannot determine, as a matter of law, that there is no reasonable likelihood that Ohlhauser will violate the securities laws in the future.

Ohlhauser additionally argues that the SEC's failure to plead scienter is fatal to their request for injunctive relief. However, this argument was premised upon this Court's adopting Ohlhauser's interpretation of § 10A. Having concluded that § 10A does not require actual knowledge of an illegal act, we must rule in favor of plaintiff with respect to this issue. Although the Court in *Aaron v. SEC*, 446 U.S. 680, 701, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) held that "when scienter is an

element of the substantive violation sought to be enjoined, it must be proved before an injunction may issue," actual knowledge of an illegal act is not a required element for imposition of liability under § 10A. *See id.* (holding that with respect to provisions that "may be violated even in the absence of scienter, nothing in the face of ... § 21(d) purports to impose an independent requirement of scienter"). Therefore, as Section 21(d) does not incorporate an independent scienter requirement, summary judgment in favor of Ohlhauser is inappropriate with respect to this issue.

## CONCLUSION

For the reasons stated above, we deny defendant Ohlhauser's motion for summary judgment.

SO ORDERED.