In re Tyco Int'l Ltd., MDL          MDL-02-1335-B 10/14/04

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**In re Tyco International, Ltd.**
**Multidistrict Litigation (MDL 1335)**

MDL DOCKET NO. 02-1335-B
**SECURITIES ACTION**
Case No. 02-266-B
**Opinion NO. 2004 DNH 154**

### MEMORANDUM AND ORDER

Plaintiffs have filed a consolidated complaint alleging multiple securities law violations against Tyco International Ltd., three of its former officers, L. Dennis Kozlowski (former Chief Executive Officer), Mark H. Swartz (former Chief Financial Officer), and Mark A. Belnick (former Chief Corporate Counsel), two of its former directors (Frank E. Walsh, Jr. and Michael A. Ashcroft) (collectively the "Tyco defendants"), and its independent accountant and auditor (PricewaterhouseCoopers ("PwC")).

Defendants have filed motions to dismiss arguing that the consolidated complaint fails to state viable claims for relief.

## I. STANDARD OF REVIEW

Defendants challenge the consolidated complaint pursuant to Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) challenge argues either that the complaint fails to describe the claims for relief in sufficient detail or that the claims are deficient even if they are pleaded with the requisite specificity. Defendants make both arguments.

The degree of detail that a complaint must contain to survive a Rule 12(b)(6) challenge depends upon the nature of the claims under review. In most cases, a plaintiff is required to provide only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While this requirement is simply stated, it has been difficult to apply in practice. A plaintiff is not required to plead evidence when a claim is governed by Rule 8(a)(2), but she must do more than simply recite the elements of the claim in a conclusory fashion. See Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, 357 F.3d 1, 9 (1st Cir. 2004). For cases that fall in the middle of these two extremes, all that can be said is that the complaint must "set forth factual allegations, either direct or inferential, respecting each

material element necessary to sustain recovery under some actionable legal theory." United States v. Melrose-Wakefield Hosp., 360 F.3d 220, 240 (1st Cir. 2004)(quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988)). Such factual allegations may be based either on personal knowledge or "information and belief." See Langadinos v. American Airlines, Inc., 199 F.3d 68, 73 n.8 (1st Cir. 2001).

Special pleading requirements apply to fraud claims. Fed. R. Civ. P. 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) requires "that the plaintiff's averments of fraud specify the time, place, and content of the alleged false or fraudulent representations." Melrose-Wakefield Hosp., 360 F.3d at 226. Moreover, when a cause of action sounding in fraud is based on "information and belief," Rule 9(b) directs the plaintiff to plead sufficient supporting facts to permit a conclusion that the alleged belief is reasonable. See id. In contrast, "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), establishes specific pleading requirements for fraud claims based on the Securities Exchange Act of 1934 ("Exchange Act").  Complaints alleging such claims must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."  15 U.S.C. § 78u-4(b)(1).  In addition, the PSLRA requires that a securities fraud claim plead facts with particularity that are sufficient to give rise to a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2).  Although the PSLRA's pleading requirements are demanding, they are not insurmountable.  The real question is whether the allegations as a whole provide enough supporting detail to warrant a conclusion that its requirements have been satisfied.  See In re Cabletron Sys., Inc., 311 F.3d 11, 40 (1st Cir. 2002).

The parties disagree as to whether the PSLRA can ever be satisfied through "group pleading."  See id. at 40 (describing group pleading).  Insofar as the group pleading doctrine merely

permits a plaintiff to rely on a presumption that statements contained in corporate press releases, SEC filings, and other similar company documents are the collective work of the company's executive officers, the doctrine does not appear to be inconsistent with either the PSLRA or Rule 9(b).  See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 367-68 (1st Cir. 1994) (applying a limited version of the group pleading doctrine to securities fraud claims under Rule 9(b)); see also In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 152-53 (D. Mass. 2001) (holding that group pleading doctrine survives PSLRA).  Whether a similar inference is warranted when it comes to a company's directors, however, will depend upon the unique facts of each case. Further, the doctrine does not relieve a plaintiff of the duty to plead sufficient facts as to each defendant to support a strong inference that the defendant acted with scienter.  Accordingly, when it comes to group pleading, the ultimate question is whether the facts of the case make it reasonable to apply the doctrine in the way that plaintiffs propose.

## II. ANALYSIS

Plaintiffs have asserted claims based on §§ 10(b), 14(a), 20(a), and 20(A) of the Exchange Act and §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"). I evaluate the sufficiency of each claim in turn.

### A. Section 10(b)

Defendants adopt a "divide and conquer" strategy in challenging plaintiffs' § 10(b) claims. They argue that the consolidated complaint alleges two distinct fraud schemes: one that involves looting and another that involves fraudulent accounting practices. They then attack the complaint's sufficiency by challenging each scheme as if it were described in a separate complaint. While I adopt a similar organizational structure in responding to defendants' arguments, I reject their premise that the two schemes are unrelated. Instead, a careful reading of the consolidated complaint reveals that it is based on allegations that the accounting fraud and looting schemes are both interrelated and interdependent. In essence, plaintiffs charge that Tyco's senior management operated the company as a criminal enterprise in which fraudulent accounting practices were

used to generate cash to fund Tyco's acquisition strategy. The looting, in turn, occurred both to benefit the individual defendants and to create incentives to continue with the accounting fraud. As I will explain, the relationship between the two schemes is important to consider when analyzing several of defendants' arguments.

### 1. Looting Claims

#### a. Santa Fe Industries, Inc. v. Green

The Tyco defendants rely on Santa Fe Industries, Inc. v. Green, 430 U.S. 462 (1977) for the proposition that plaintiffs' looting allegations describe mere corporate mismanagement that cannot support a claim under the securities laws. This argument is based both on a misreading of Santa Fe Industries and on a mischaracterization of plaintiffs' looting claims.

Santa Fe Industries concerned a challenge by minority shareholders to a parent corporation's attempt to merge with its partially owned subsidiary under Delaware's short form merger statute, Del. Code Ann. Tit. 8, § 253. The short form merger statute permits a parent corporation that owns at least 90% of its subsidiary's stock to merge with the subsidiary by offering

to acquire the minority shareholders' stock at a price specified by the parent.  See Santa Fe Indus., 430 U.S. at 465.  If the minority shareholders are dissatisfied with the proposed price, the statute permits them to file suit in state court to recover the difference between the proposed price and the stock's fair value.  See id. at 465-66.  The plaintiffs in Santa Fe Industries filed an action in federal court charging that the parent had violated § 10(b) by attempting to use the short form merger statute to acquire their stock at substantially less than its fair market value.  See id. at 467.  The Supreme Court rejected the § 10(b) claim and the case has since been widely cited for the proposition that "[t]o the extent that [a] claim comprises allegations of mismanagement, it is not cognizable under the securities laws."  Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1207 (1st Cir. 1996); see also In re Advanta Corp. Sec. Litig., 180 F.3d 525, 537 (3d Cir. 1999); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982).

It is important to bear in mind when considering Santa Fe Industries, however, that the complaint that was before the court in that case did not allege that the defendants had made any

misstatements or omissions of material fact in connection with the purchase or sale of a security.  See id. at 474 (recognizing that "the finding of the District Court, undisturbed by the Court of Appeals, was that there was no 'omission' or misstatement in the information statement accompanying the notice of merger").  Thus, the decision does not necessarily preclude a claim such as the one at issue here, which is based on the concealment of allegedly material information concerning corporate misconduct rather than on the underlying misconduct itself.

Defendants nevertheless argue that a plaintiff can never be permitted to base a § 10(b) claim on a failure to disclose corporate misconduct if the misconduct would support a breach of fiduciary duty claim under state law.  Otherwise, they argue, quintessentially state law claims could always be transformed into federal securities law violations merely by alleging that defendants failed to disclose the misconduct.  But this argument overstates the case.  In Estate of Soler v. Rodriguez, 63 F.3d 45 (1st Cir. 1995), the First Circuit flatly rejected the view that an otherwise actionable claim under § 10(b) is barred by Santa Fe Industries merely because it is based on a failure to disclose

-10-

conduct that can be remedied through a breach of fiduciary duty claim under state law.  See id. at 56.

Other circuits have struggled in the wake of Santa Fe Industries to articulate a more nuanced standard to distinguish cases in which the failure to disclose mismanagement will support a § 10(b) claim from those in which it will not.  Four circuit opinions illustrate these efforts.  In Kas v. Financial General Bankshares, Inc., 796 F.2d 508 (D.C. Cir. 1986), the District of Columbia Circuit acknowledged that a § 10(b) claim cannot be based on a failure to disclose mismanagement where the omission's materiality depends solely on either a legal judgment that the defendants' conduct amounts to a breach of fiduciary duty or a determination that the defendants' motives were improper.  Id. at 513.  At the same time, however, the court recognized that "Santa Fe certainly does not preclude liability under sections 10(b) and 14(a) where a proxy statement fails to disclose either that a member of management has a personal stake in the corporate decision being made or that some special relationship exists between a member of management and some party with interests adverse to the shareholders."  Id.  The Third Circuit, in In re Craftmatic Sec. Litig., 890 F.2d 628 (3d Cir. 1989) similarly

-11-

suggested that Santa Fe Industries will bar an otherwise actionable § 10(b) claim where the omitted information is material only because it would "place potential investors on notice that management is culpable of a breach of faith or incompetence . . . ." Id. at 640. In Panter v. Marshall Field & Co., 646 F.2d 271 (7th Cir. 1981), the Seventh Circuit determined that Santa Fe Industries will bar a § 10(b) claim that is based on the failure to disclose mismanagement when the "central thrust" of the claim is mismanagement rather than the concealment of material information from investors. Id. at 289. Finally, in 7547 Corp. v. Parker & Parsley Dev., 38 F.3d 211 (5th Cir. 1994), the Fifth Circuit concluded that the complaint before it stated a viable claim under § 10(b) notwithstanding the defendants' agreement that it was based on the failure to disclose fiduciary breaches because "the breaches of fiduciary duty held violative of rule 10-b(5) included some element of deception." Id. at 231 (quoting Santa Fe Indus., 430 U.S. at 474-75).

I need not determine which circuit court's test best separates actionable mismanagement claims from a nonactionable claims because the complaint at issue here would survive dismissal under any plausible test. Unlike other cases in which

§ 10(b) claims have been dismissed on the basis of <u>Santa Fe</u> <u>Industries</u>, this case concerns an alleged failure to disclose material information about compensation and related party transactions that must be accurately disclosed to investors pursuant to SEC regulations. <u>See</u> discussion <u>infra</u> Part II.A.1.d. Moreover, the consolidated complaint alleges that the omitted information was material, not merely because it demonstrated an exercise of poor judgment or even a lack of good faith by senior management, but because it concerned the transfer of hundreds of millions of dollars from Tyco to the individual defendants in unauthorized compensation for their participation in a larger criminal scheme to inflate the price of Tyco's stock through fraudulent accounting practices. Such allegations plainly amount to more than the type of mere mismanagement that cannot serve as the basis of a viable § 10(b) claim after <u>Santa Fe Industries</u>.

      b.   <u>Fraud "in connection with" the sale</u>
          <u>or purchase of a security</u>

Defendants next argue that the looting allegations will not support a § 10(b) claim because the looting did not occur "in connection with" the purchase or sale of a security. 15 U.S.C. § 78j(b). In essence, defendants argue that the looting claims

-13-

consist of nothing more than charges of self-dealing by the individual defendants at Tyco's expense. These charges, they argue, have nothing to do with the purchase or sale of any security. This argument mischaracterizes the plaintiffs' looting claims.

A fair reading of the consolidated complaint demonstrates that plaintiffs base their looting claims not on the looting itself, but on misrepresentations and omissions that Tyco and the individual defendants allegedly made about the looting in various SEC filings. In a case such as this, which involves a publicly traded security, the "in connection with" requirement is satisfied "by showing that the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely, and that they were material when disseminated." Semerenko v. Cendant Corp., 223 F.3d 165, 176 (3d Cir. 2000); see also McGann v. Ernst & Young, 102 F.3d 390, 392-93 (9th Cir. 1996); In Re Ames Dep't Stores, Inc. Stock Litig., 991 F.2d 953, 963 (2d Cir. 1993). As investors plainly are entitled to assume that SEC filings are accurate and complete, and plaintiffs have sufficiently claimed that the misrepresentations and omissions concerning looting were

material,[1] plaintiffs easily satisfy the "in connection with" the sale or purchase of a security requirement.

c. <u>Scienter</u>

Tyco argues that the scienter of the individual defendants cannot be attributed to it because it was an innocent victim of the looting. In making this argument, Tyco invokes the "adverse interest" exception to the general rule that "scienter alleged against the company's agents is enough to plead scienter for the company." <u>In re Cabletron</u>, 311 F.3d at 40. The adverse interest exception potentially applies where "an agent secretly is acting adversely to the principal and entirely for his own or another's purposes . . . ." Restatement (Second) of Agency § 282; <u>see also</u> <u>Wight v. BankAmerica Corp.</u>, 219 F.3d 79, 87 (2d Cir. 2000) (applying New York law).

---

[1] Although defendants argue otherwise, their position on this point is so insubstantial that it does not require extensive analysis. An omitted fact is material if its disclosure "would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988). Moreover, materiality generally presents a question of fact for the jury. <u>See</u> <u>Gebhardt v. ConAgra Foods, Inc.</u>, 335 F.3d 824, 829 (8th Cir. 2003). Specific allegations that senior management looted a company of hundreds of millions of dollars in previously undisclosed benefits clearly presents a triable argument that the undisclosed information was material.

Tyco's argument is unavailing for two reasons, each of which is independently sufficient to resolve the matter. First, plaintiffs contend that the adverse interest exception is inapplicable because the individual defendants did not act "entirely for their own benefit" when they engaged in the looting. Instead, plaintiffs argue that the consolidated complaint can fairly be read to charge that the looting was a part of a larger scheme to artificially inflate the price of Tyco's stock through fraudulent accounting practices. According to plaintiffs, the accounting fraud scheme benefitted Tyco by allowing it to generate cash through stock sales and borrowing to fund its acquisition strategy, and the looting furthered the fraud scheme by giving the individual defendants a financial incentive to implement the scheme. While plaintiffs ultimately may not be able to prove this theory at trial, it is sufficient at this stage of the proceedings to rebut Tyco's reliance on the adverse interest exception.

Plaintiffs alternatively argue that the adverse interest exception is itself subject to an exception "when an innocent third-party relies on representations made with apparent authority." Donald C. Langevourt, Agency Law Inside the

Corporation: Problems of Candor and Knowledge, 71 U. Cin. L. Rev. 1187, 1214 (2003); see also Restatement (Third) of Agency, § 5.04 (Tentative Draft No. 4, 2003). The exception potentially applies here to the extent that plaintiffs qualify as innocent third parties who were justified in believing that the individual defendants were acting with Tyco's authority when they made the misstatements and omissions on which the looting claims are based.

I agree with plaintiffs that the adverse interest exception is inapplicable when a corporate officer or director makes a material misstatement or omission to an innocent third-party while acting with the apparent authority of the corporation for whom he works. The First Circuit, in In re Atlantic Financial Management, 784 F.2d 29 (1st Cir. 1986), recognized as much when it held that "a corporation's liability for an agent's misrepresentations may rest upon a theory of 'apparent authority.'" Id. at 31-32 (quoting Restatement (Second) of Agency, § 8). Although the misrepresentations that were at issue in that case were not adverse to the corporate defendants' interests, the risk allocation policies that led the court to apply the apparent authority doctrine to misstatements generally apply with equal

force when the misstatements are adverse to the corporation's interests. Compare In re Atlantic, 784 F.2d at 32 (fair and efficient allocation of risk favors application of apparent authority doctrine to § 10(b) claim) with Restatement (Third) of Agency § 5.04 cmt. C (Tentative Draft No. 4, 2003) (fair and efficient allocation of risk justifies innocent party exception to adverse interest rule). Accordingly, because the consolidated complaint properly pleads both that the plaintiffs are innocent parties and that the individual defendants acted with apparent authority when they allegedly made the misstatements and omissions on which the looting claims are based, the complaint sufficiently alleges that the scienter of the individual defendants is attributable to Tyco.

d. Duty to disclose

Tyco next argues that the looting claims are not actionable because it was not required to disclose the looting.

A § 10(b) claim cannot be based on a failure to disclose information unless the omitted information was material and the defendant was under a duty to disclose it. See Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996). The First Circuit has recognized three circumstances in which a corporation may be

-18-

required to disclose material, nonpublic information. The first is when the corporation has made a statement of material fact that becomes false or misleading if the undisclosed information is omitted. See Gross, 93 F.3d at 992. The second is when insiders trade stock or a corporation issues stock on the basis of the undisclosed information. See Shaw, 82 F.3d at 1204. The third is when a statute or regulation requires the information to be disclosed. See Gross, 93 F.3d at 992 n.4; Shaw, 82 F.3d at 1202 n.3. Plaintiffs rely on the third circumstance, claiming that Tyco was required to disclose the looting under items 402 and 404 of SEC Regulation S-K.

Item 402 requires "the disclosure of all plan and non-plan compensation awarded to, earned by, or paid to" the corporation's directors, its CEO, its four most highly compensated executive officers, and up to two additional individuals who would have been among the most highly paid if they had been executive officers. 17 C.F.R. § 229.402. Item 404 requires the disclosure of "transactions" involving more than $60,000 between the corporation and its directors, executive officers, nominees for director positions, individuals who own more than 5% of a corporation's stock, and immediate family members of any person

subject to the disclosure requirement. 17 C.F.R. § 229.404.
Plaintiffs argue that Tyco was required to disclose the looting
either as compensation or as related party transactions.

Tyco offers three arguments in opposition. First, it
asserts that it was not required to disclose the looting because
looting involves the taking of property without authorization.
Items 402 and 404, by contrast, apply only if a corporation is a
willing participant in a financial transaction. I disagree.
This is not a case of routine theft by a low-ranking employee,
which obviously would not be covered by Items 402 and 404.
Instead, plaintiffs charge that Kozlowski, Swartz, and other
senior executives ran Tyco as a criminal enterprise and that
Kozlowski authorized the looting as compensation for
participation in a larger scheme to artificially inflate the
price of Tyco's stock. Defendants have failed to present a
persuasive case that the benefits authorized by a corporation's
CEO are exempt from disclosure under Items 402 and 404 merely
because the benefits were concealed from the corporation's
directors.

Tyco's second argument is that it was not required to report
the looting because its board of directors did not learn of it

until long after it occurred.  As I have explained in discussing Tyco's scienter argument, because Kozlowski's knowledge of the looting is attributable to Tyco, this contention does not relieve Tyco of liability.

Finally, Tyco argues that plaintiffs cannot base their claims on Items 402 and 404 because these regulations do not give rise to a private right of action for damages.  This argument fails because although plaintiffs rely on Items 402 and 404 to establish that Tyco had a duty to disclose the looting, they base their cause of action on § 10(b), rather than on the disclosure regulations themselves.  It is no longer open to dispute that a private right of action exists to enforce § 10(b) when the elements of a § 10(b) violation are present.  <u>See</u> <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 385-87 (1983).  I find no support in the language, structure, or purpose of Items 402 and 404 to support defendants' argument that a person who fails to disclose material information that is required by items 402 and 404 cannot be sued for damages pursuant to § 10(b) when the other elements of a § 10(b) claim have been satisfied.

## 2.  Accounting Fraud Claims

Plaintiffs dedicate more than 220 paragraphs of the consolidated complaint to a recitation of allegedly false and misleading statements and omissions by the defendants concerning Tyco's financial condition.  In a separate section, they describe several accounting schemes that defendants allegedly used to mislead investors.  Then, they attempt to support their stated belief that the specified statements were misleading by citing to findings in the Boies reports[2] that Tyco engaged in "aggressive accounting" of the types described in the consolidated complaint and by pointing to billions of dollars in restatements and corrections that Tyco was required to make to address past accounting errors.  They seek to support their claim that defendants acted with scienter by charging that: (1) the targeted accounting practices plainly violated Generally Accepted Accounting Principles ("GAAP") and thus were unlikely to have

_____

[2]  The Boies reports were the result of a limited investigation of Tyco, conducted in 2002 by the law firm Boies, Schiller & Flexner, LLP at Tyco's direction.  The investigation was principally restricted to "the integrity of the company's financials and the possible existence of systemic or significant fraud, or other improper accounting that would materially adversely affect the Company's reported earnings or cashflow from operations in 2003 or thereafter."  Compl. ¶¶ 28, 665.

been innocently adopted; (2) the identified restatements are so large that they are indicative of fraud; and (3) the allegations of massive looting and hundreds of millions of dollars in stock sales by insiders at inflated prices give rise to a strong inference that the defendants acted with scienter. Finally, the plaintiffs assert that they suffered compensable injuries that were caused, at least in part, by the alleged accounting fraud. Not surprisingly, defendants argue that these allegations are not described in sufficient detail to survive a motion to dismiss. I examine defendants' most significant arguments in turn.

a. <u>Identification of misleading statements and omissions</u>

The PSLRA requires a plaintiff pleading securities fraud to "specify each statement alleged to have been misleading." 15 U.S.C. § 78U-4(b)(1). Plaintiffs satisfy this requirement by identifying hundreds of specific statements in press releases, quarterly (Form 10-Q) and annual (Form 10-K) reports, other SEC forms including 8-K's, S-8's and S-4's, proxy statements, statements made by several of the individual defendants during conference calls with the media, and statements from third parties that identify individual defendants as the source of

their information.  The sheer quantity of these statements prevents me from describing all of them and, in any event, such a recitation is not required.  See In re Cabletron, 311 F.3d at 28-33.  Nevertheless, I list a few  to illustrate the general tone of the consolidated complaint:

- ▸ 2000 10-K incorrectly listed net income as $4,519.9 million (Compl. ¶ 462);

- ▸ 2000 Proxy Statement falsely listed Kozlowski and Swartz as having no outstanding loans from Tyco (Compl. ¶ 317);

- ▸ 2000 Annual Report to Shareholders falsely stated that Tyco's "exceptional financial results" were the product of its "growth-on-growth" strategy (Compl. ¶ 467);

- ▸ January 17, 2001 Conference Call where CEO Kozlowski misleadingly reported that revenue was up 21% for the quarter as a result of organic growth (Compl. ¶ 477);

- ▸ March 16, 2001 Form S-3 and related Prospectus incorporated the same materially false and misleading statements set forth in Tyco's Annual Report on Form 10-K for fiscal year ended September 30, 2000, Tyco's 10-Q's and Form 8-K's, and the Consent of PwC, dated March 14, 2001, permitting the incorporation by reference of PwC's materially false and misleading report, dated October 24, 2000 (Compl. ¶ 500-03);

- ▸ 2001 10-K incorrectly listed net income for fiscal 2001 as $3,970.6 million (Compl. ¶ 571).

These statements and others of similar ilk adequately specify the "time, place, and content" of each allegedly misleading

statement.  <u>Aldridge v. A.T. Cross Corp.</u>, 284 F.3d 72, 78 (1st Cir. 2002).

PwC charges that plaintiffs have failed to identify any misstatements that it made on Tyco's behalf, but a careful review of the consolidated complaint reveals that plaintiffs base their claims against PwC on its allegedly false statements in audit letters, dated October 21, 1999, October 24, 2000, and October 18, 2001, that Tyco's financial statements had been prepared in accordance with GAAP and that PwC's audits of Tyco had been conducted in accordance with Generally Accepted Accounting Standards ("GAAS").  Compl. ¶¶ 169-72.  These allegations identify the misstatements on which plaintiffs' claims are based with the partiality required by the PSLRA.

> b.  <u>Reasons why statements are misleading</u>

The PSLRA also requires a plaintiff to explain why each specifically identified statement is misleading.  <u>See</u> 15 U.S.C. § 78U-4(b)(1).  Plaintiffs seek to satisfy this requirement by describing several different accounting schemes that defendants allegedly used to artificially inflate the price of Tyco's stock. First, they claim that Tyco caused several specified acquisition targets to overstate reserves, pre-pay expenses, and engage in

other similar actions prior to the acquisition to make it appear that the target company was growing more rapidly after the acquisition than in fact was the case. Second, they charge that Tyco failed to properly disclose a $4.5 billion impairment to the goodwill of one of its subsidiaries. Third, they claim that Tyco improperly recognized as earnings hundreds of millions of dollars in excess reimbursements from independent dealers at another of its subsidiaries, rather than spreading the reimbursements over the life of the dealer contracts as GAAP requires. Finally, they charge that Tyco failed to disclose certain specified practices that violated federal income tax laws.[3]

Defendants counter that these allegations are insufficient because plaintiffs have not properly linked their theories of accounting fraud to the specific statements that they claim are misleading. Condemning plaintiffs' organizational approach as impermissible "puzzle pleading," they argue that the PSLRA requires a plaintiff to separately identify each allegedly

---

[3] The consolidated complaint also charges that Tyco misleadingly failed to disclose hundreds of acquisitions and failed to employ sufficient internal accounting controls. It is unclear whether these allegations are intended to stand as independent accounting fraud claims or whether they merely support the complaint's central allegations.

misleading statement and immediately thereafter list the reasons why the statement is misleading. The consolidated complaint fails to meet this requirement, defendants claim, because it lists all of the misleading statements in one section but describes the accounting schemes that make the statements misleading in different sections. Although I am sympathetic to defendants' contention that the consolidated complaint is difficult to decipher, I do not agree that it is so poorly drafted that it violates the PSLRA. After identifying each specific misleading statement, the complaint refers readers to other sections that list multiple reasons why the statement is misleading. This is a reasonable way to address a complicated securities fraud case. It does not violate the PSLRA merely because it makes the complaint difficult to understand.

Defendants next argue that the consolidated complaint is deficient because it fails to identify specific amounts by which various accounts were misstated. The PSLRA, however, does not require such specificity if the complaint otherwise provides a detailed description of the fraud schemes. See Aldridge, 284 F.3d at 81. Plaintiffs support their claim that Tyco engaged in acquisition accounting fraud by identifying several acquisition

targets and describing the types of charges and other financial machinations that occurred at the target companies before the acquisitions were completed. When describing their allegation that Tyco failed to properly record impairments to goodwill, plaintiffs identify the affected subsidiaries and the amount by which the goodwill was overstated. In describing Tyco's alleged failure to properly account for dealer reimbursements, plaintiffs again identify the affected subsidiary, describe the fraud scheme in detail and explain how the improper accounting affected the accuracy of Tyco's financial statements. Finally, plaintiffs explain that Tyco allegedly committed undisclosed tax fraud by instructing companies with which it was doing business to direct rebate checks to offshore subsidiaries of Tyco where they would not be subject to United States income taxes. No more is required to satisfy this aspect of the PSLRA.

PwC argues that the consolidated complaint fails to sufficiently explain why the statements on which plaintiffs' claims against it are based were misleading. Again, I disagree. Much like the complaint in Kinney v. Metro Global Media, Inc., 170 F. Supp. 2d 173 (D.R.I. 2001), plaintiffs charge the company's independent accountant with issuing unqualified audit

reports certifying the company's financial statements for specific years and claiming that the audits were performed in conformity with GAAS.  Also, as in <u>Kinney</u>, the complaint lists a number of auditing standards and principles allegedly violated by PwC which, taken as a whole, render the certified financial statements materially misleading.[4]  Here, as in <u>Kinney</u>, the

---

[4]  The consolidated complaint lists the numerous GAAP violations that are alleged to have occurred during the class period.  These include:  (1) the improper accounting for acquisitions; (2) manipulation of accounting reserves for the purpose of inflating Tyco's reported operating result; (3) failure to timely recognize expenses, including impairment of corporate assets; (4) failure to disclose material related party transactions (the corporate looting explained in Part II.A.1. <u>supra</u>); (5) engaging in "aggressive" accounting for the purpose of inflating Tyco's reported results; (6) failure to appropriately restate previously issued and materially misleading financial statements; (7) improper recognition of "reimbursements" from independent dealers; (8) failure to disclose accounting policies in accordance with GAAP; and (9) the failure to disclose material contingent liabilities and significant risks and uncertainties.

The consolidated complaint additionally lists audit violations of GAAS by PwC.  These include:  (1) violation of GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP; (2) violation of GAAS Standard of Reporting No. 4 because PwC should have stated that no opinion on Tyco's financial statements could be reported; (3) violation of GAAS General Standard No. 2 that requires independence in mental attitude be maintained by the auditor; (4) violation of SAS No. 54 in that PwC failed to perform the audit procedures required in response to possible improper acts by Tyco; (5) violations of SAS No. 1 and No. 53 by failing to adequately plan its audit and

-29-

"[p]laintiffs specified *each* statement they alleged to be misleading [(the audit statements of financial statements, dated October 21, 1999, October 24, 2000, and October 18, 2001 (Compl. ¶¶ 24, 170-72), and registration statements and prospectuses filed during the class period that incorporated PwC's audit reports with PwC's consent (<u>E.g.</u>, Compl. ¶¶ 24, 173, 286))] *and* specified the reasons why the statements were allegedly

_____

properly supervise the work and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements; (6) violation of GAAS General Standard No. 3 which requires that due professional care must be exercised by the auditor; (7) violation of GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial, and managerial controls, to determine whether reliance thereon is justified; and (8) violation of SAS No. 82 in that it failed to adequately consider the risk that the audited financial statements were free from material misstatements, whether caused by errors or fraud, and that PwC ignored several risk factors, including: (a) an excessive interest by management in maintaining or increasing the entity's stock price through the use of aggressive accounting; (b) a failure by management to display and communicate an appropriate attitude regarding internal controls and the financial reporting process; (c) management displaying a particular disregard for regulatory authority; (d) management continuing to employ an ineffective accounting or internal auditing staff; (e) significant party-related transactions not in the ordinary course of business or with related entities not audited or audited by another firm; and (f) significant bank accounts or subsidiary or branch operations in tax-haven jurisdictions for which there appears to be no clear business justification.

-30-

misleading [(violations of GAAP, violations of GAAS, failure to report inadequate internal controls at Tyco, failure to report looting behavior, etc.)]. . . ." Id. at 179. And like the court in Kinney, these detailed allegations are sufficient to survive a motion to dismiss even under the heightened pleading standards of the PSLRA. Id.

c.    Facts supporting belief that
      statements are misleading

The PSLRA requires a plaintiff to explain with particularity why allegations made on information or belief are reasonable. 15 U.S.C. 78U-4(a)(1). Defendants argue that plaintiffs have failed to satisfy this requirement with respect to their acquisition accounting fraud claims.

A careful review of the consolidated complaint reveals that plaintiffs have pleaded sufficient facts to support their asserted belief that defendants engaged in acquisition accounting fraud. Plaintiffs devote more than 20 paragraphs to a specification of facts that they claim support their belief on this point. Although several of their assertions are based on newspaper accounts and reports from independent analysts, plaintiffs also cite to admissions by Tyco such as its statement

-31-

that "there were instances where prior management appeared to influence the management of an acquisition target into adopting accounting treatments that 'over-accrued' expenses prior to an acquisition's consummation or otherwise exceed what was permitted by GAAP." Compl. ¶ 106. When these allegations are viewed in the context of the complaint as a whole, they are sufficient to satisfy this aspect of the PSLRA.

d. Scienter

Defendants next argue that the consolidated complaint does not support a strong inference that they acted with scienter. "Liability under section 10(b) and Rule 10b-5 . . . requires scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" In re Cabletron, 311 F.3d at 38 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)). Scienter also "may extend to a form of extreme recklessness that 'is closer to a lesser form of intent.'" In re Cabletron, 311 F.3d at 38 (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 198-99 (1st Cir. 1999); see also Aldridge, 284 F.3d at 82. Under the PSLRA, "the plaintiff must . . . show that the inferences of scienter are both reasonable and *strong*."

Aldridge, 284 F.3d at 78 (quotations omitted). The First Circuit, however, has "rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case." In re Cabletron, 311 F.3d at 38 (quoting Aldridge, 284 F.3d at 82); see also Greebel, 194 F.3d at 196. While scienter can be established through direct evidence of "conscious wrongdoing," other types of evidence also may be considered. "[T]he plaintiff may combine various facts and circumstances indicating fraudulent intent - including those demonstrating motive and opportunity - to satisfy the scienter requirement." Aldridge, 284 F.3d at 82.

Although by no means exhaustive, some of the types of circumstantial evidence that have been found to be relevant in pleading scienter are: (1) GAAP violations, see In re Cabletron, 311 F.3d at 39; (2) accounting shenanigans, see id.; Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001); (3) large-scale fraudulent practices over time, see In re Cabletron, 311 F.3d at 39; (4) stock sales by insiders, see, e.g., In re Cabletron, 311 F.3d at 39-40; (5) the quick settlement of an ancillary fraud suit, see Greenstone v. Cambex Corp., 975 F.2d 22, 26-27 (1st

Cir. 1992); (6) disregard for the most current financial information when making statements, see Glassman v. Computervision Corp., 90 F.3d 617, 627 (1st Cir. 1996); (7) the self-interest of defendants in saving their own salaries or jobs, see Serabian, 24 F.3d at 368; and (8) financial restatements, see Aldridge, 284 F.3d at 83. While no single factor will generally be sufficient to support a strong inference of scienter, a combination of several factors may satisfy the requirement. See In re Cabletron, 311 F.3d at 40.

Plaintiffs have identified several different factors in this case that are collectively sufficient to support a strong inference that Kozlowski, Swartz, and Belnick acted with scienter. First, plaintiffs describe a massive fraud scheme perpetrated by the company's senior management over an extended period of time. Second, they claim that the various accounting schemes employed by the defendants violated well-established accounting practices and, in some cases, were adopted in disregard of advice provided by the company's outside auditors. Third, they claim that Kozlowski, Swartz, and Belnick reaped hundreds of millions of dollars in benefits during the course of

the fraud scheme in undisclosed compensation, related party transactions, and stock sales at inflated prices. While no one of these factors standing alone would be sufficient, the consolidated complaint as a whole pleads enough culpable facts to give rise to a strong inference that these defendants acted with scienter. Further, as I have explained previously when discussing plaintiffs' looting claims (see discussion supra Part II.A.1.c.), these allegations also satisfy the PSLRA's pleading requirements with respect to Tyco because the scienter of its senior executives can be attributed to the company for whom they worked.

Walsh and Ashcroft arguably are in a different position from the other individual defendants because they served as outside directors. Plaintiffs charge that Walsh served as Tyco's lead director and claim that he was actively involved in negotiations surrounding the CIT acquisition, one of the major transactions on which the consolidated complaint is based. They also allege that Kozlowski caused Tyco to pay Walsh a $20 million fee for his work in connection with the CIT acquisition and that Walsh later pleaded guilty to a criminal charge in which he admitted that he

knowingly concealed the $20 million payment.  These allegations are sufficient to support a strong inference that Walsh acted with scienter with respect to his alleged failure to disclose the $20 million fee.  Whether they are also sufficient to support an inference that he was a culpable participant in the alleged accounting fraud schemes, however, is a more difficult question that the parties have not adequately briefed.  Because I am not confident that I can reliably resolve the issue without their help, I leave its resolution for a later date.

The allegations against Ashcroft, in contrast, do not reach the necessary threshold to make out a valid claim that he acted with scienter.  The consolidated complaint's sole claim that he received undisclosed benefits involved the sale of his Florida home.  The complaint charges that Ashcroft sold the home to his wife for $100 and that she immediately resold it to a Tyco employee for $2.5 million.  The complaint further charges that Tyco funds were used to cover the purchase price and that the home thereafter was used by Kozlowski rather than its nominal owner.  Plaintiffs, however, do not allege that Ashcroft was aware that the home had been purchased with Tyco funds.  This is

in sharp contrast to the allegations against Walsh, because the complaint asserts that Walsh agreed with Kozlowski to conceal the $20 million "finders fee." While the complaint also charges that Ashcroft signed various SEC filings in his capacity as a director, and sold in excess of $100 million in Tyco stock during the class period, it does not allege that he was involved in the day-to-day management of the company or that he was otherwise privy to management decisionmaking concerning the allegedly fraudulent accounting practices. Under these circumstances, allegations that he signed corporate filings and sold large amounts of stock are not sufficient, by themselves, to establish scienter. For this reason, the consolidated complaint does not state a viable § 10(b) claim against Ashcroft.

Plaintiffs cite several facts to support their contention that PwC acted with the degree of recklessness that is required to support a § 10(b) claim against a company's outside accountant. First, they allege that PwC had a motive to acquiesce in the accounting fraud scheme because Tyco was a long-standing PwC client and had paid PwC more than $51 million in fees during fiscal year 2001 alone. Second, plaintiffs charge

that PwC had ample opportunity to detect the accounting fraud and ensure that its statements about Tyco's financial condition were correct because PwC personnel were regularly present at Tyco's corporate headquarters during the class period and had full access to the company's accounting records. Plaintiffs further charge that the accounting problems at Tyco should have been readily detectable by PwC during the audit process because Tyco has since admitted that: its internal accounting controls were inadequate; it engaged in "aggressive accounting" during the period covered by PwC's audit letters; its earnings during the class period were overstated by $5.6 billion; and its senior executives looted hundreds of millions of dollars from the company during the class period. Plaintiffs also cite evidence that they claim demonstrates that even though PwC was placed on notice of the existence of loans from Tyco, these loans nevertheless were not disclosed in the manner required by GAAP. While no one of these factors alone would be sufficient to support a strong inference that PwC acted with scienter, collectively they are sufficient to give rise to a strong inference that PwC acted with the degree of recklessness required

to support a finding of scienter.[5]

     e.  <u>Loss Causation</u>

Defendants next argue that plaintiffs have failed to adequately plead that the accounting fraud claims caused the losses for which they are seeking compensation. To survive a Rule 12(b)(6) challenge to a § 10(b) claim, a plaintiff must allege that "the act or omission of the defendant alleged to violate [§10(b)] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Two types of causation must be alleged: "loss causation," which addresses the relationship between a misleading act or omission and stock price, and "transaction causation," which addresses the relationship between a misleading act or omission and the

_____

[5] PwC argues that the amounts of allegedly unauthorized loans to the individual defendants were in fact disclosed in the aggregate. As plaintiffs note, however, it was not the existence of employee loan programs that were omitted, but the improper transactions between Tyco and the related parties that abused these programs. Plaintiffs claim that PwC's alleged failure to identify the specific material related party transactions, the nature of the transactions, and the dollar amount for each transaction constituted a breach of GAAP. Disclosing aggregate dollar amounts of outstanding loans in general categories while concealing the details thus does not avoid the misconduct on which plaintiffs' claim is based.

plaintiff's decision to buy or sell stock.  See CitiBank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992).  Defendants argue that plaintiffs have failed to properly plead loss causation.

Most courts that have addressed the issue of loss causation have held that a plaintiff ultimately must prove that a change in stock price is causally linked to a corrective disclosure of misleading information.  See, e.g., Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003); Semerenko, 223 F.3d at 184-185; Robbins v. Koger Prop. Inc., 116 F.3d 1441, 1447 (11th Cir. 1997); Bastian v. Petren Res. Corp., 892 F.2d 680, 685-86 (7th Cir. 1990); but see Broudo v. Dura Pharm., Inc., 339 F.3d 933, 938 (9th Cir. 2003); cert. granted (change in stock price not required); In re Control Data Corp. Sec. Litig., 933 F.2d 616, 619-20 (8th Cir. 1991) (same). Defendants adopt this view in arguing that plaintiffs have failed to sufficiently plead loss causation with respect to their accounting fraud claims.  Their argument is that because the consolidated complaint explicitly links decreases in Tyco's stock price only to disclosures of looting by senior management, the complaint does not properly plead loss causation with respect to

the accounting fraud claims.

I reject defendants' argument because it is based on an unfairly narrow reading of the consolidated complaint. While I agree that the sole paragraph in the complaint that is expressly devoted to the subject of loss causation charges that decreases in Tyco's stock price were causally linked to disclosures that senior management allegedly had engaged in looting and other criminal conduct, the same paragraph also alleges that the price decreases occurred "as the Tyco defendants fought off attacks on the credibility of the company's financial statements and the integrity of its management." Compl. ¶ 716. As other paragraphs make clear, the attacks that defendants were resisting were directed at many of the accounting machinations on which the present claims are based. Reading the complaint as a whole, it thus fairly charges that Tyco's stock price declined in part because investors concluded that they could no longer credit the company's denials of accounting misconduct. These allegations are sufficiently particular to survive a Rule 12(b)(6) challenge.

f. Other arguments

Defendants also charge that many of the consolidated

complaint's allegedly misleading statements are not actionable because: (1) they qualify as mere puffery; (2) they are forward-looking statements protected by the PSLRA's safe harbor provision, 15 U.S.C. § 780-5(a)(1); or (3) they were made by third parties and cannot be attributed to the defendants. I decline to consider the merits of these arguments because they would not produce a complete dismissal of any of the charges even if they prove to be valid. Defendants may raise these arguments again later if they can demonstrate that a ruling from the court would significantly affect the scope of discovery, the possibility of settlement, or the nature of the trial.

## B.   Section 14(a)

Section 14(a) of the Exchange Act punishes misleading statements or omissions of material fact that are made in connection with the solicitation of proxies. "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the

accomplishment of the transaction.'" Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir. 1992) (quoting Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 385 (1970)). This third step requires a plaintiff to "establish a causal nexus between the[] alleged injury and some corporate transaction authorized (or defeated) as a result of the allegedly false and misleading proxy statements." Royal Bus Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1063 (1st Cir. 1991).

Plaintiffs base their § 14(a) claims on proxy statements issued by Tyco on March 1, 2000, January 29, 2001, and January 28, 2002. Compl. ¶ 731. The consolidated complaint asserts that these statements sought proxies in order to reelect directors, allow director remuneration to be set by the board, and reappoint PwC as Tyco's auditor. Although the complaint is not clear on this point, plaintiffs apparently contend that misleading statements and omissions in the proxy statements led to the adoption of the specified measures and that these measures, in turn, injured plaintiffs in their capacities as shareholders.

Defendants argue, among other things, that plaintiffs have failed to properly plead causation. In making this argument,

they rely primarily on the Third Circuit's decision in <u>General Electric Co. v. Cathcart</u>, 980 F.2d 927 (3d Cir. 1992), in which the court rejected a § 14(a) claim for damages resulting from alleged mismanagement by directors who were reelected on the basis of allegedly misleading proxy statements. <u>Id.</u> at 933. There, the court reasoned that damages that are subsequently caused by directors who are elected on the basis of misleading proxy statements are simply too remote from the misleading statements themselves to support a claim under § 14(a). <u>See</u> <u>id.</u> Plaintiffs have not attempted to respond to defendants' plausible causation argument, and thus they have waived their right to object to the dismissal of the § 14(a) claims on this basis. <u>See, e.g.</u>, <u>Michelson v. Digital Fin. Servs.</u>, 167 F.3d 715, 720 (1st Cir. 1999) (failure to respond to properly presented argument constitutes waiver of right to object).

C.    <u>Sections 11 & 12(a)(2)</u>

Defendants challenge plaintiffs' claims under §§ 11 and 12(a)(2) of the Securities Act by claiming that plaintiffs have failed to plead their claims with the particularity required by Rule 9(b).

Section 11 creates a right of action for damages by securities purchasers when registration statements contain untrue statements of material fact or material omissions, and plaintiffs can trace their shares to those registration statements. 15 U.S.C. § 77k(a). Under § 11, the company, any signer of the misleading registration statement, the directors of the company, and any accountant that certified or prepared any report or valuation used in connection with the registration statement, may be held liable. See Versyss Inc. v. Coopers & Lybrand, Etc., 982 F.2d 653, 657 (1st Cir. 1992) ("Section 11 . . . is remarkably stringent where it applies, readily imposing liability on ancillary parties to the registration statement (like accountants) for the benefit even of purchasers after the original offering."). Under § 12(a)(2), all a plaintiff need show is that he purchased a security pursuant to a prospectus or oral communication that contained an untrue statement of material fact or a material omission. 15 U.S.C. § 77l(a)(2). The only relevant difference between a § 11 and a § 12(a)(2) claim is that the latter includes oral statements and plaintiffs must demonstrate that the named defendants were sellers or offerors of

Tyco stock.  <u>Compare</u> 15 U.S.C. § 77k(a) <u>with</u> 15 U.S.C. § 77l(a)(2).

Neither § 11 nor § 12(a)(2) requires an allegation of scienter.  <u>See</u> <u>Shaw</u>, 82 F.3d at 1223.  Nevertheless, the First Circuit has recognized that "a complaint asserting violations of [§§ 11 and 12(a)(2)] may yet sound[] in fraud" and thus may be subject to the rigorous pleading requirements established by Rule 9(b).  <u>Id.</u>  Defendants argue that plaintiffs' claim under § 11 and § 12(a)(2) are so steeped in fraud that they are required to plead their claims with particularity.  I disagree.

Even if I assume, as defendants insist, that fraud lies at the core of plaintiffs' claims, I would not dismiss otherwise sufficient claims under §§ 11 and 12(a)(2) merely because they fail to plead fraud with particularity.  Instead, the proper remedy for a failure to comply with Rule 9(b) would be to strike any deficient allegations and then assess the sufficiency of the remaining allegations.  <u>See</u> <u>Vess v. CIBA-Geigy Corp., USA</u>, 317 F.3d 1097, 1104-05 (9th Cir. 2003); <u>Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.</u>, 238 F.3d 363, 368 (5th Cir. 2001); <u>Carlon v. Thaman (In re Nationsmart Corp. Sec. Litig.)</u>, 130 F.3d 309, 315

(8th Cir. 1997).  In the present case, because plaintiffs do not base their §§ 11 and 12(a)(2) claims on fraud, there are no allegations of fraud to strike.  Further, because the claims easily satisfy the much less demanding requirements of Rule 8(a), they are not subject to dismissal pursuant to Rule 12(b)(6).

PwC also challenges plaintiffs' § 11 claim by arguing that plaintiffs have not sufficiently alleged that their stock purchases can be traced to a misleading registration statement. In making this argument, PwC rightly contends that in order to have standing to bring a § 11 claim, a plaintiff must aver that the shares he purchased are traceable to the offering covered by the allegedly misleading registration statement.  See, e.g., Krim v. PcOrder.com, Inc., No. A-00-CA-776-§, 2003 WL 21076787 (W.D. Tex. May 5, 2003) (plaintiffs who could not trace securities to the registration statement lacked standing under § 11).  Contrary to PwC's position, however, plaintiffs have pled traceability by asserting that they "acquired Tyco shares issued pursuant to, or traceable to, and in reliance on, the Registration Statements/ Prospectuses."  Compl. ¶ 757.  Since a motion to dismiss is not the appropriate forum to test the veracity of such assertions,

they are sufficient to plead traceability and therefore to establish plaintiffs' standing to sue. See In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 694 (S.D.N.Y. 2000) (plaintiffs' allegation in complaint "that they made their purchases 'pursuant to and/or traceable to the Registration Statement'" sufficient to plead traceability and establish standing for § 11 claims).

D.  **Sections 20(a) and 15**

Plaintiffs also assert claims under § 20(a) of the Exchange Act and § 15 of the Securities Act against Kozlowski, Swartz, Belnick, Walsh, and Ashcroft. Both sections impose derivative liability on defendants who "control" primary violators of the securities laws. See 14 U.S.C. § 78t(a); 15 U.S.C. § 77o. Because I have already determined that the consolidated complaint states primary violations under § 10(b) of the Exchange Act and §§ 11 and 12(a)(2) of the Securities Act, the only remaining question is whether the complaint sufficiently alleges that the individual defendants controlled the primary violators. On this issue, the First Circuit has stated that "the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the

-48-

company." Aldridge, 284 F.3d at 85. It also has acknowledged, however, that "[c]ontrol is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage.'" In re Cabletron, 311 F.3d at 41 (quoting 2 T.L. Hazen, Treatise on the Law of Securities Regulation, § 12.24(1) (4th ed. 2002)).

Only Walsh and Ashcroft present serious arguments for dismissal of plaintiffs' "control person" claims. Plaintiffs respond by noting that both defendants served as directors and signed allegedly false SEC filings on Tyco's behalf. However, "[t]he assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person . . . ." See Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1108 (10th Cir. 2003). The only additional allegations that plaintiffs make with respect to Ashcroft are that he was a major shareholder and once served as the CEO of a corporation that Tyco later acquired. These facts do not add enough evidence of control to salvage plaintiffs' control person claims against Ashcroft. Plaintiffs'

claims against Walsh are marginally stronger because the complaint alleges that Walsh was the company's lead outside director, was actively involved in at least one of the major transactions on which the claims are based, and succeeded in negotiating a $20 million "finders fee" for himself in connection with that transaction. This evidence is sufficient, although barely so, to survive a motion to dismiss. Accordingly, I grant Ashcroft's motion to dismiss the control personal claims against him, but deny Walsh's corresponding motion.

E.   **Section 20A**

Plaintiffs next assert claims under § 20A of the Exchange Act against Kozlowski, Swartz, Belnick, Walsh, and Ashcroft. Section 20A creates a private right of action for insider trading. It potentially covers "[a]ny person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information . . . ." 15 U.S.C. § 78t-1. Plaintiffs charge that the individual defendants violated this provision by selling hundreds of millions of dollars in Tyco stock without disclosing the looting and

-50-

accounting fraud described in the consolidated complaint.

All five individual defendants argue that the § 20A claims are defective because plaintiffs have failed to sufficiently allege that they committed underlying violations of the Exchange Act. As I have explained, this argument is valid only with respect to Ashcroft.

Walsh also argues that the § 20A claim against him is invalid because the stock sales on which the claim is based were made to fund additional purchases of Tyco stock through the exercise of stock options. Walsh fails to cite any case law to support this argument. Nor does he explain why such transactions may never count as stock sales under § 20A. I decline to speculate about the merits of an argument that has not been properly developed. Accordingly, I reject his motion to dismiss on this basis.

## F.    **Statutes of Limitation**

Plaintiffs' claims under § 10(b) and § 20(a) of the Exchange Act and § 11, § 12(a)(2), and § 15 of the Securities Act are subject to one-year statutes of limitation that begin to run from the date that the plaintiffs knew or reasonably should have known

of the facts on which the claims are based.[6]  See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 n.9 (1991) (§ 10(b) claims); Westinghouse Elec. Corp. v. Franklin, 993 F.2d 349, 353 (2d Cir. 1993) (§ 14(a) claims); Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 n.2 (2d Cir. 1993) (§ 20(a) claims); Short v. Belleville Shoe Mfg. Co., 908 F.2d 1385, 1390 (7th Cir. 1990) (§ 11 and 12(a)(2) claims); Tracinda Corp. v. DaimlerChrysler AG, 197 F. Supp. 2d 42, 55 n.5 (D. Del. 2002) (§ 15 claims).  Defendants argue that plaintiffs' acquisition accounting fraud claims are barred by these statutes of limitation to the extent that they are based on conduct that occurred more than one year before the complaints asserting the claims were filed.  Plaintiffs respond by contending that their

---

[6]  The Sarbanes-Oxly Act, Pub. L. 107-204, created a two-year statute of limitation that potentially applies in proceedings that are commenced after the Act's June 30, 2002 effective date.  See 28 U.S.C. § 1658.  The new limitation period covers private rights of action that involve "a claim of fraud, deceit, manipulation, or contrivance in contradiction of a regulatory requirement concerning the securities laws as defined in Section 3(a)(47) of the Securities Exchange Act of 1934."  28 U.S.C. § 1658.  The parties disagree as to whether the two-year limitation period applies to plaintiffs' Securities Act claims. I decline to resolve this issue because I determine that the claims should not be dismissed even if they are subject to only a one-year limitation period.

claims are not time-barred because they acted promptly after learning of their potential claims.

A two-part test is used in this circuit to determine whether a plaintiff has sufficient notice of a securities claim to trigger the one-year limitations period. First, the party invoking the statute must demonstrate that sufficient "storm warnings"[7] of fraud were on the horizon to trigger a duty to inquire further. See Young v. Lepone, 305 F.3d 1, 9 (1st Cir. 2002). If the defendant satisfies this requirement, the plaintiff must respond with evidence establishing that even a reasonably diligent investigation would not earlier have produced sufficient evidence to permit the filing of a viable complaint. See id.; see also Marks v. CDW Computer Ctrs., 122 F.3d 363, 367 (7th Cir. 1997) ("not only must the investor be on notice of the need to conduct further inquiry, but the investor also must be able to learn the facts underlying the claim with the exercise of

---

[7] The First Circuit has explained that "storm warnings" exist "[w]hen telltale warning signs augur that fraud is afoot," such that if the warning signs are "sufficiently portentous," they may, "as a matter of law be deemed to alert a reasonable investor to the possibility of fraudulent conduct." Young v. Lepone, 305 F.3d 1, 8 (1st Cir. 2002).

reasonable diligence"). It is only when a reasonably diligent investigation would have identified sufficient evidence to permit the filing of a legally sufficient complaint that the statute of limitation begins to run. See Young, 305 F.3d at 9. Both parts of this test present issues of fact. See id. Thus, a dispute about whether sufficient storm warnings were present to deny the plaintiff the benefit of the discovery rule generally will not be resolvable on a motion to dismiss, unless it is plain from the complaint itself that the plaintiffs' claims are time-barred. See id. at 9; see also LC Capital Partners, L.P. v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003).

Defendants attempt to satisfy the first part of this test by pointing to what they argue are multiple storm warnings that acquisition accounting fraud was occurring well more than a year prior to the filing of a complaint. In particular, they point to: (1) the publication of analysts' reports and newspaper articles in October 1999 accusing Tyco of acquisition accounting fraud; (2) the announcement by Tyco in December 1999 that the SEC had commenced an investigation into Tyco's acquisition accounting; (3) the significant drop in Tyco's stock price that

followed the announcement of the SEC investigation; and (4) the commencement of litigation against Tyco based on acquisition accounting fraud in December 1999.

Plaintiffs challenge the sufficiency of these storm warnings, but even more persuasively argue that a reasonably diligent investigation would not have produced enough information to permit them to earlier file legally sufficient securities fraud complaints. This is so, plaintiffs claim, because defendants denied that they were engaging in acquisition accounting fraud and took steps to conceal their misconduct. These steps would have prevented even a diligent investor from earlier developing the information needed to sue. The most compelling evidence that plaintiffs cite in support of this point is the fact that the SEC closed its investigation of Tyco in July 2000 without uncovering the acquisition accounting fraud scheme. Plaintiffs thus sensibly claim that a reasonable investor could not have uncovered sufficient evidence to support an acquisition accounting fraud claim if the SEC, with far greater resources, was unable to do so itself.

I need not resolve this dispute to dispose of defendants'
argument. It is enough at this stage of the proceedings to say
that this is not a case in which I can determine when the
statutes of limitation began to run based solely on the facts
pleaded in the consolidated complaint.[8]

III.    **CONCLUSION**

For the reasons set forth in this Memorandum and Order, I
grant defendants' motions to dismiss to the extent that they seek
dismissal of plaintiffs' claims under § 14(a) of the Exchange
Act. I also grant Ashcroft's motion to dismiss plaintiffs'

---

[8] Plaintiffs' claims are also subject to statutes of repose.
The Sarbanes-Oxly Act extended the repose period from three years
to five years for private rights of action that are asserted in
proceedings that are commenced after July 30, 2002 and that
involve "a claim of fraud, deceit, manipulation, or contrivance
of a regulatory requirement concerning the securities laws as
defined in Section 3(a)(47) of the Securities Exchange Act of
1934." 28 U.S.C. § 1658. The parties disagree as to whether the
Sarbanes-Oxly Act applies to plaintiffs' Securities Act claims.
I decline to resolve this dispute now because it appears that
few, if any, of plaintiffs' claims would be substantially
affected by the resolution of this dispute. Defendants may raise
this argument later if they can demonstrate that a ruling from
the court would significantly affect the scope of discovery, the
possibility of settlement, or the nature of the trial.

claims against him under § 10(b), § 20(a) and § 20A of the Exchange Act and § 15 of the Securities Act.  In all other respects, defendants' motions to dismiss (Doc. Nos. 43, 46, 47, 49, 50, and 51) are denied.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

October 14, 2004

cc:   Counsel of Record